**Ronnie Joe GLENN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–96–0011–CR.**

Court of Appeals of Texas, Amarillo.

March 31, 1998.

Rehearing Overruled May 18, 1998.

O'Shea & Forcum, P.C. (John J.C. O'Shea), Lubbock, for Appellant.

Lubbock County District Attorney (William C. Sowder, Sherry A. Phillips), Lubbock, for Appellee.

Before BOYD, C.J., and DODSON and QUINN, JJ.

DODSON, Justice.

From a guilty plea pursuant to a plea bargain, appellant Ronnie Joe Glenn was convicted of possession of less than twenty-eight grams of methamphetamine. Upon finding the indictment's single enhancement averment true, the court, honoring the plea agreement, assessed appellant's punishment at fifteen years confinement in the Texas Department of Criminal Justice, Institutional Division. In two points of error, appellant contends the trial court erred in overruling (1) his motion to suppress evidence obtained after his illegal arrest, and (2) his motion for new trial. We affirm.

The evidence shows that appellant exited his apartment, went to his car and began to leave the area in his car when he was

stopped by Lubbock police officers. The officers were acting on information they had concerning appellant's drug dealing activities and information received from an informant that appellant had amphetamines in his car and would shortly make a delivery of that controlled substance.

The appellant refused the officers' request for permission to search his vehicle. At that time, the officers detained the appellant in a patrol vehicle and requested the assistance of the department's officer in charge of the drug detection dog. When the officer arrived with the dog and began to work around the car, the appellant became upset and kicked a side door window out of the patrol car. At that time, the officers arrested the appellant and placed him in jail.

The dog gave an affirmative indication that drugs were in the vehicle. Thereafter, the officers obtained a search warrant, executed the warrant and found drugs in the appellant's vehicle.

In his first point of error, the appellant claims the trial court committed reversible error when it denied his motion to suppress evidence obtained after an illegal arrest. In this connection, the State contends that the appellant has waived error asserted by his first point because he has included both state and federal constitutional provisions and contentions without providing substantial argument or analysis on each separate state and federal constitution issue and contention.

To support its position, the State, in essence, relies on footnote 23 at pages 690–91 in *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr. App.1991) where the court reiterated that when briefing constitutional issues, attorneys should carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground to avoid the court overruling the ground as multifarious when insufficient distinction between state and federal constitutional grounds is not provided by counsel. Nevertheless, in essence, the court's suggested remedy was rebriefing.

In this instance, the primary issue presented by appellant's briefs is whether his detention was a de facto arrest rather than temporary investigative detention. After the decision in *Heitman*, the court in *Davis v. State*, 829 S.W.2d 218, 219 (Tex.Cr.App. 1992), applied the federal investigative detention rules without a separate state analysis. We deem it unnecessary, as suggested in *Heitman*, to require additional briefs in this instance. The appellant has filed three briefs and the State one. We must determine the issues presented on the applicable state and federal law; therefore, we overrule the State's waiver contention.

We now proceed to the merits of the appellant's first point of error. Under this point of error the appellant claims that he was illegally arrested without probable cause, that the search of his automobile was the result of his unlawful arrest and, therefore, the evidence obtained from the search was inadmissible, as the fruits of his alleged illegal arrest. Nevertheless, the State claims that appellant's detention was an investigative detention based on articulable facts, that under the circumstances, the investigation was conducted in a diligent manner and without unreasonable delay, that the evidence was obtained under a lawfully issued search warrant (which was not challenged) and was admissible and that the trial court did not abuse its discretion by admitting the challenged evidence.

■ In determining whether the trial court abused its discretion, we will make a de novo review under the "totality of the circumstances test." *See Guzman v. State*, 955 S.W.2d 85, 87, 89, 91 (Tex.Cr.App.1997). Likewise, as stated in *Guzman*, "[e]ach search and seizure question must turn on the facts of that particular case." *Id.* at 90.

■ It is well established that circumstances short of probable cause will justify temporary detention for investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Garza v. State*, 771 S.W.2d 549, 558 (Tex.Cr.App.1989) (where the Court of Criminal Appeals adopted the *Terry* standards). Under *Terry*, to justify investigative detention, the officers must have articulable facts which, based on their experience and personal knowledge, when coupled with logical inferences from those facts, would warrant the intrusion on

the detainee. These facts must amount to more than a mere hunch, a guess or a vague suspicion. *Williams v. State,* 621 S.W.2d 609, 612 (Tex.Cr.App.1981). The articulable facts used by the officers must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to a crime or an offense. *Garza v. State,* 771 S.W.2d at 558.

 In this instance, the appellant was stopped on an anonymous tip and other information known to the officers when they detained the appellant. An anonymous tip, standing alone, will usually justify the commencement of an investigation, but will seldom provide the reasonable suspicion necessary to authorize an investigative stop and detention. *Glass v. State,* 681 S.W.2d 599, 601 (Tex.Cr.App.1984). Nevertheless, that inadequacy may be compensated for by the corroborative efforts of police officials who verify the details of information supplied to them where such information is corroborated, it is accumulative of and tends to verify other information known to the officer concerning the detainees suspected of illicit activity. *See Illinois v. Gates,* 462 U.S. 213, 242–43, 103 S.Ct. 2317, 2334–35, 76 L.Ed.2d 527, 550–52 (1983).

 An officer's prior knowledge, his experience, and his corroboration of the details of the tip may be considered in assigning weight to the tip. *See Alabama v. White,* 496 U.S. 325, 329–30, 110 S.Ct. 2412, 2415–16, 110 L.Ed.2d 301 (1990). In addition, the following are significant in determining whether reasonable suspicion exists for a temporary detention based upon information from an unknown tipster: (1) accurately predicting future behavior of third parties, *id.;* (2) corroboration of a detail linking the accused to the stated criminal activity, *Ramirez v. State,* 658 S.W.2d 808 (Tex.App.—Corpus Christi 1983), *aff'd* 672 S.W.2d 480 (Tex.Cr.App.1984); and (3) a particularized and objective reason to suspect the accused. *Davis v. State,* 829 S.W.2d 218, 221 (Tex.Cr.App.1992). Of course, where, as here, there has been cooperation between law enforcement officers, the total of all information

known at the time of the detention may be considered in determining whether the basis of the action is adequate. *Woodward v. State,* 668 S.W.2d 337, 344 (Tex.Cr.App.1982).

When determining from a totality of the circumstances whether the officer had sufficient information (*i.e.,* articulable facts to justify the stop) the *Terry* court cautioned against making too much of labels such as "stop" versus "arrest," because of the necessity to examine each level of police intrusion to assure that the intrusion is reasonable under the circumstances. *Terry v. Ohio,* 392 U.S. at 17, 88 S.Ct. at 1877. As the court stated in *Francis v. State,* 896 S.W.2d 406, 411 (Tex.App.—Houston [1st Dist.] 1995), *pet. dism'd. improvidently granted,* 922 S.W.2d 176 (Tex.Cr.App.1996), it is more useful to examine each progressive level of intrusion to determine if the intrusion is reasonable under the circumstances based on the information known to the officers at the time, rather than to focus on a particular segment of the transaction to see if the segment fits into a particular category of police intrusion. Focusing on a particular segment of the transaction rather than considering the totality of all the circumstances was condemned in *Guzman v. State,* 955 S.W.2d at 87.

The *Francis* court particularly warned against the use of inadequate standards to distinguish an arrest from a temporary investigative detention, such as: (1) whether one's liberty of movement has been restricted; (2) whether a person has been actually placed under restraint; and (3) whether a reasonable person would have believed that he was not free to leave.

The "liberty of movement restriction" language had its origin in *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), nine years before *Terry v. Ohio* authorized investigative detention based on articulable facts. It arose at a time when arrest was the *only* category of seizure, and as suggested by the *Francis* court it is not an adequate standard for distinguishing between arrest and detention because *detention* is a characteristic common to both.

In Texas, "actual restraint" originated in article 15.22, Texas Code of Criminal Procedure, which provides that

a person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant.

This definition was enacted before the emergence of the *Terry* temporary investigative detention concept. *Amores v. State*, 816 S.W.2d 407, 418, n. 3 (Tex.Cr.App.1991). As stated by the *Francis* court, article 15.22 cannot be useful to distinguish arrests from temporary detentions because it pre-dated *Terry* and was not enacted with this distinction in mind. *Francis v. State*, 896 S.W.2d at 410. Also, the *Francis* court further pointed out that recent Texas cases do not rely *solely* on article 15.22 but utilize the "totality of the circumstance" approach to distinguish between arrest and investigation detention. *Id.* at 410–11. *See also, Hoag v. State*, 728 S.W.2d 375 (Tex.Cr.App.1987).

The "not free to leave" standard is inadequate to use when distinguishing between arrest and investigative detention because it is common to both. The standard is useful to distinguish a police seizure from an encounter with police; however, it does nothing to help, but much to hinder, the task of distinguishing a detention from an arrest.[1] *Francis v. State*, 896 S.W.2d at 411. Consequently, we conclude that in determining whether the trial court abused its discretion by overruling the appellant's motion to suppress the challenged evidence, we must ascertain whether the record shows from the totality of the circumstances that the officers had articulable facts to support the appellant's detention. *See Terry v. Ohio, supra* and *Garza v. State*, 771 S.W.2d at 558.

The articulable facts employed in this case shows that at about 4:15 p.m. on March 26, 1994, Lubbock Police Officer Kevin Cox talked to an anonymous informant, who had telephoned the police station. The informant told Cox that he had been to appellant's residence within the last hour. The informant had observed white powder, packaged in clear plastic baggies, in the rear hatchback portion of appellant's white Ford Mustang. Appellant's Mustang was reportedly parked in front of apartment number 72 at the Fairway Villa Apartment Complex. The informant also told Cox that appellant would be leaving in the Mustang with a load of amphetamines within the next couple of hours.

After talking to the anonymous phone caller, Cox drove by the apartment, but appellant's car was not parked outside. Cox next contacted David Brooks, an investigator with the South Plains Regional Narcotics Task Force. Brooks knew appellant and told Cox that the information supplied by the anonymous caller was consistent with his knowledge about appellant. Brooks testified that his knowledge about appellant was gained through "informants" and a narcotics officer with the Department of Public Safety.

About 45 minutes after Cox received the anonymous phone call at the police station, both he and Brooks initiated surveillance on the apartment. At that time, appellant's Mustang was parked in front of the apartment. At about 6:30 p.m., appellant exited apartment number 72, approached the Mustang, got inside, and closed the door. The officers used another car to block appellant from leaving the parking space. At that time, Officer Cox, dressed in his police uniform, approached appellant's car and identified himself. Appellant exited the car, closed the door, and asked the officers about what was happening.

Cox and Brooks took appellant by the arms, and moved him to a nearby patrol car, and placed him in the back seat. After appellant was inside the patrol car, the officers explained that he was not under arrest but was merely being detained. Cox informed appellant that he had obtained information that appellant had amphetamines in his car, gave appellant his *Miranda* warnings, and asked appellant for his consent to search the car.[2] Appellant refused to give

---

1. The three categories of police-civilian interaction (*i.e.*, encounter, detention, and arrest) are defined and discussed in *Francis*, 896 S.W.2d at 408, 409.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

his consent for them to search his car. Appellant was confined to the back seat and did not mention that he was claustrophobic. At trial, Cox explained that appellant was detained because the vehicle was mobile and, if they permitted appellant to leave with the car, he could escape and destroy the drugs.

After appellant refused to give his consent to the search of his car, the officers contacted Corporal Aubrey Stark, who was in charge of a drug detection dog. About 45 minutes to an hour later, Stark brought a drug detection dog to the scene. Subsequently, the dog gave two indications that a controlled substance was inside the Mustang. The officers then decided to get a search warrant. While the dog was working around the car, the appellant broke a window in the patrol car. As a result, appellant was arrested for criminal mischief and taken to jail.

After the officers obtained a search warrant, they returned to the car's location and searched the car. Upon searching the car, the police found a "cassette case containing two baggies of [methamphetamine], one set of gram scales," and appellant's driver's license.

At the suppression hearing, appellant testified that he had an attention deficient disorder and is dyslexic and claustrophobic. Appellant admitted that he had resided in number 72 of the Fairway Villa Apartments. On the day of his arrest, appellant said that a friend borrowed his car. Immediately after his arrest, appellant said that he told the officers he was claustrophobic and could not breathe. Appellant claimed the officers never asked to search his car but said that they wanted to search his apartment. The officers never told him why he was detained.

▪ In making our review of a pretrial hearing on a motion to suppress evidence seized as a result of an alleged illegal arrest, we are mindful that the trial court is the exclusive trier of fact and its findings will not be disturbed if supported by the evidence. *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Cr.App.1979). It is the duty of the trial court to resolve conflicts in the testimony at a suppression hearing. *Sanchez v. State*, 582 S.W.2d 813, 815 (Tex.Cr.App.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62

L.Ed.2d 728 (1980), *also, see Guzman v. State*, 955 S.W.2d at 89.

▪ In this instance, the informant had personally been to appellant's apartment, seen his car, described what appeared to be controlled substances in the car, and specifically identified a drug that was to be possessed. The informant predicted appellant's future behavior in leaving the apartment in his car within a couple of hours. Before appellant exited the apartment, Cox had already verified that Brooks knew appellant. The information supplied by the unknown caller was consistent with other information known about appellant. Brooks had obtained this information about appellant from other informants and another officer. Consequently, appellant was linked to illegal drug distribution and the officers had a particularized reason to suspect appellant.

▪ When appellant exited the apartment and entered his car, the officers had corroborated every aspect of the tip except the presence of drugs. The officers did not handcuff appellant, told him he was being detained not arrested, did not use threatening language, did not draw firearms, and moved him only a few feet to the back seat of a patrol car. The drug detection dog arrived about 45 minutes to an hour after appellant's initial detention began. When the dog gave indications that drugs were in the car, the reasonable suspicion ripened into probable cause to arrest. *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983); *Walsh v. State*, 743 S.W.2d 687, 689 (Tex.App.—Houston [1st Dist.] 1987, no pet.). Appellant was arrested at the scene thereafter for committing another criminal offense.

Having reasonable suspicion to continue the detention, the time lapse between the stop and decision to call out the drug detection dog was very short. The delay in the arrival of the dog after the stop was approximately 45 minutes to an hour. In this connection, throughout his brief the appellant impliedly suggested that a controlling matter in the arrest determination is the time factor. He uses terms such as "short" and "brief" delay to impliedly suggest that the time from the initial encounter to the actual arrest (*i.e.,*

when taken to the police station) was too long and caused the initial encounter (*i.e.,* stop) to constitute a warrantless arrest without probable cause. In that regard, we point out that the appellant does not acknowledge, cite or in any manner discuss *Terry v. Ohio* and the investigative stop and detention doctrine established by the Court in that case.

Nevertheless, anticipating the court's concern for the time element from the initial stop to the actual arrest by removing the appellant to the police station after he broke the patrol car window, the State points out that the time element in this instance is less than the 90 minute delay in *United States v. Place,* 462 U.S. 696, 702, 705–06, 103 S.Ct. 2637, 2642–44, 77 L.Ed.2d 110 (1983). In *Place,* the Court determined that holding the defendant's luggage for 90 minutes for the arrival of the drug detection dog was unreasonable. However, the rationale underlying the 90 minute determination in *Place* was premised on the fact that the police knew of defendant's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding defendant's luggage for 90 minutes.

We do not deem *Place* controlling or persuasive here. In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Court hastened to point out that "Terry, Dunaway, Royer, and Place, considered together, may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest." *Id.* The Court further stated: "[O]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. *But our cases* impose no rigid time limitation on Terry stops." *Id.* (emphasis added).

The *Sharpe* Court commented that as "[M]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Id.* The *Sharpe* Court further stated from *Place* that: "... [w]e expressly rejected the suggestion that it [the

court] adopt a hard-and-fast time limit for a permissible Terry stop," and reiterated that:

> We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. *Nevertheless, we question the wisdom of a rigid time limitation.* Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.... *U.S. v. Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575 (quoting *Place* ) (emphasis added).

In *Sharpe,* the Court articulated guidelines for assessing the effect of the length of the detention as follows:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, *we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant....* *Id.* (emphasis added).

and the Court further stated:

> A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.... A creative judge engaged in post hoc evaluation of police conduct can almost always imagine ... some alternative means by which the objectives of the police might have been accomplished. *But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable...." Id.* at 686–87, 105 S.Ct. at 1575–76 quoting *Cady v. Dombrowski,* 413 U.S. 433, 437, 93 S.Ct. 2523, 2526, 37 L.Ed.2d 706 (1973) (emphasis added).

In essence, *Sharpe* teaches that there are no rigid or hard and fast time limitations on *Terry* (*i.e.,* investigative) stops and that the controlling determination is whether, under the circumstances, the officers pursued their investigation in a quick, diligent and reasonable manner to either confirm or dispel their

suspicion of criminal activity by the detained person.

■ In this instance, the record shows that Officers Cox and Brooks pursued the investigation in a quick, diligent, and reasonable manner. After the officers verified the informant's information that appellant would leave the apartment and enter the suspect vehicle, they employed a minimally intrusive method of investigation in confirming their suspicions, *i.e.*, the drug dog. *See United States v. Sharpe*, 470 U.S. at 687, 105 S.Ct. at 1576.

In sum, after examining the totality of the circumstances, we conclude that the officers had articulable facts to justify the appellant's investigative detention and we further conclude under the circumstances that the officers pursued the investigation quickly, diligently and reasonably. Consequently, we determine that the trial court did not abuse its discretion by overruling the appellant's suppression motion. Accordingly, we overrule appellant's first point of error.

In point of error two, appellant claims the trial court erred in overruling his motion for new trial. We disagree. This point presented nothing for further review and the same is overruled.

In sum, we overrule appellant's two points of error and affirm the trial court's judgment.

QUINN, J., dissenting.

QUINN, Justice, dissenting.

I respectfully dissent because the trial court effectively held that the State may *arrest* someone without probable cause in order to buy time to search his property with a drug dog. Simply put, that is not the law.

Based upon a tip from an anonymous informant and a police officer's "familiarity" with appellant, at least two police officers began a stake-out of appellant's white Ford Mustang. For approximately two hours they sat watching until he exited an apartment and entered the vehicle. Both officers testified that up until that time *neither had seen him violate any law.* Indeed, one went so far as to quip, at the suppression hearing, that if such a

violation had been seen, he would have immediately arrested appellant.

Upon seeing appellant enter the Mustang, one of the two policemen drove his squad car behind appellant's vehicle to block its egress. Appellant undoubtedly noticed this for he exited the car and closed its door. By that time, the two officers had also left their cars and began to approach their quarry. According to one of them, appellant "inquired what we wanted," and the other stated that "we . . . identified ourselves, and asked for a Consent to Search on [sic] the vehicle." Appellant refused their request. Thereafter, the officers admitted to "grabb[ing]" appellant by each arm, informing him of his *Miranda* rights and placing him in the back seat of the squad car. So too did an officer acknowledge telling appellant that if he did not consent to the search, they would secure the presence of a drug dog to sniff the Mustang. This attempt at persuasion also failed to garner the desired response. So, the officers phoned someone with the "DEA Task Force."

Approximately 45 to 60 minutes passed before a drug dog arrived at the scene with its handler. Throughout this time appellant sat *locked* in the rear seat of the police car. That appellant was not free to leave the scene went uncontested as did the fact that he could not even remove himself from the squad car. Indeed, the officers not only admitted as much but also testified that the rear windows were closed and could not be rolled down, that the front and rear seats were separated by a plexiglass "prisoner shield," and that the inside handles of the rear doors were "removed to prevent escape of prisoners or anyone in the back." In short, appellant was utterly at the mercy of his captors, and effectively jailed (though his jail had wheels).

Upon arrival of the drug dog, it was led to the Mustang. After sniffing the car, it alerted to the presence of drugs. With this information in hand, the two officers who originally grabbed appellant left to obtain a search warrant. However, appellant remained at the scene in the back seat of the police vehicle and under the supervision of one or more uniformed policemen. Several hours

passed before a warrant was obtained and the search performed.

Neither officer at the suppression hearing testified that they had probable cause to arrest appellant or to search his car. Again, they admitted that they had yet to see appellant commit any criminal act before they blocked his car, took hold of him, and locked him in the rear of the police car. Indeed, when asked if they initially curtailed his liberty *"predicated alone* upon ... this [tip from an] anonymous caller," the testifying officer candidly replied "yes." (emphasis added). So too did they acknowledge that the information garnered up to that point would not have authorized his arrest. Whether for this reason or some other, the State also avoided arguing that the policemen had probable cause to arrest appellant or search his car. Rather, the prosecutor contended that they had reasonable suspicion to believe crime was afoot. Thus, the officers were allegedly entitled to "detain" appellant while they obtained a drug dog to investigate further. The trial court agreed, as did the majority at bar, but I do not.

The type of investigative detention condoned by law "is one during which the police are allowed to briefly question a suspicious person respecting his identity, his reason for being in the area or location, and to make similar reasonable inquiries of a truly investigative nature." *Amores v. State,* 816 S.W.2d 407, 412 (Tex.Crim.App.1991); *State v. Mora,* 872 S.W.2d 803, 806 (Tex.App.—Amarillo 1994, no pet.). Moreover, the amount of restraint contemplated and authorized is less than that encompassed in an arrest. *Id.* In other words, the duration and manner of the detention cannot smack of an arrest. And though I recognize that the line between a mere detention and an arrest is hardly black and white, I conclude that the totality of the circumstances at bar inescapably depict restraint tantamount to an arrest.

The officers first blocked appellant's egress with their car; in *Amores,* the Texas Court of Criminal Appeals considered such a tactic indicative of an arrest rather than a mere detention. *Amores v. State,* 816 S.W.2d at 411. After blocking his egress, they physically grabbed him; that too, ac-

cording to the Court of Criminal Appeals indicated arrest. *Id.* at 411 n. 7, *citing, Hogan v. State,* 631 S.W.2d 159 (Tex.Crim. App.1982); *accord Curry v. State,* 699 S.W.2d 331, 334 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd) (holding that it was reasonable to assume appellant was in custody and arrested when the officer "grabbed" appellant's arm). So too did their placing appellant within the locked confines of the squad car, *Carey v. State,* 695 S.W.2d 306 (Tex.App.—Amarillo 1985, no pet.), and uttering few, if any, questions or comments to appellant during their purported investigation illustrate an arrest. *Amores v. State,* 816 S.W.2d at 412; *State v. Mora,* 872 S.W.2d at 806. Aside from their identifying themselves, asking for consent to search, and threatening him with the use of a drug dog if he chose not to consent, the record illustrated that little else was said by the officers.

In *Carey,* this court held that "the action of [Officer] Dawson, acting under the badge of his authority after having advised appellant of the *Miranda* warnings, in putting appellant in the police car without telling him he was free to leave, amounted to a detention *indistinguishable from an arrest." Id.* at 310–11. No less occurred here. So, unless I avoid the precedent of this very court, I cannot but hold that appellant was under arrest long before the dog appeared and provided the arresting officers with probable cause to search the vehicle. *See De Jesus v. State,* 917 S.W.2d 458, 461 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd) (stating that a "positive alert for narcotics made by a police canine establishes probable cause for an arrest"). Nor can I but hold that the resulting search was unreasonable given the illegality of appellant's initial restraint.

Moreover, it is the type of the restrictions imposed upon appellant that distinguishes this case from *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In the latter, the United States Supreme Court stated, in no uncertain words, that it dealt solely with the issue of time and its relationship to the reasonableness of the search. *Id.* at 683–85, 84 L.Ed.2d at 613–15. Sharpe had not asked it to consider the manner of his detention, only the duration. For this reason, the Court felt compelled to

distinguish such cases as *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) which "focus[ed] . . . primarily on facts other than the duration of the defendant's detention." *United States v. Sharpe,* 470 U.S. at 684, 105 S.Ct. at 1574, 84 L.Ed.2d at 614.[1] Given this, I find *Sharpe* quite inapposite to the circumstances at bar. *See United States v. Bloomfield,* 40 F.3d 910 (8th Cir.1994) (holding that the amount of time lapsed did not render the search unreasonable given the absence of evidence indicating that the defendant was handcuffed or *confined* in a police car); *United States v. Willis,* 967 F.2d 1220 (8th Cir.1992) (holding the same).[2]

In sum, and regardless of how they are construed, the facts established that the police arrested appellant without probable cause in order to prevent his lawful departure and buy time to search his vehicle. There was no temporary detention in order to placate their suspicion of criminal activity; instead, they simply violated his right to be free of an unreasonable search and seizure. Thus, the evidence garnered as a result of the unlawful act was tainted and, therefore, inadmissible.

---

1. Interestingly, in both *Dunaway* and *Royer,* the search was ultimately found illegal because of the type of detention suffered upon the defendant. In the former, the suspect was apprehended and taken to police headquarters for interrogation. In the latter, he was stopped in an airport, questioned, and then confined in a small room 40 feet from the spot of the initial stop and questioned again.

2. *Bloomfield* is a case relied upon by the State here.