**Stephen Christian SANDERS,**
**Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–98–0298–CR.**

Court of Appeals of Texas,
Amarillo.

April 28, 1999.

Rehearing Overruled May 27, 1999.

R. Walton Weaver, Amarillo, for appellant.

Potter County Attorney (Sonya Letson, Jennifer Lively), Amarillo, for appellee.

Before BOYD, C.J., and QUINN and JOHNSON, JJ.

PHIL JOHNSON, Justice.

Stephen Christian Sanders appeals his conviction for possession of marihuana pursuant to a plea of guilty. The trial court assessed punishment at 90 days in jail plus costs of court. By his sole point of error, Sanders contends that the trial court abused its discretion by failing to determine that his initial detention was illegal and by failing to suppress the marihuana which he was convicted of possessing. We affirm.

## FACTS AND HISTORY

Appellant was arrested on February 4, 1998 for the Class B misdemeanor of possession of marihuana. Appellant filed a pre-trial motion to suppress the marihuana that was discovered by police during what he alleges was an illegal stop of his vehicle. The trial court denied the motion and issued findings of fact and conclusions of law. By his sole point of error, appellant contends that the trial court abused its discretion by failing to determine that appellant was illegally detained and by failing to suppress the marihuana as being fruit of the illegal detention.

The only witness to testify at the hearing on the motion to suppress was arresting officer David Lavigne. Lavigne testified that he had been an officer with the Amarillo Police Department thirteen years and that he was on duty on the night of February 4, 1998. He was one of several officers working in the Wolflin area in Amarillo where there had been numerous burglaries. The officers had been assigned "to flood the area ... to see if [they] could catch the burglars." At approximately midnight, Lavigne was advised by the police dispatcher of an attempted burglary in the Wolflin area. He was assigned to proceed to the scene and investigate the reported crime. Lavigne was told only that the attempted burglary was by two male subjects with flashlights who fled on foot northbound in an alley.

Lavigne immediately proceeded toward the location of the crime. Three or four blocks driving distance from the scene of the reported attempted burglary, Lavigne

encountered and stopped an automobile with two persons in it. The vehicle was heading away from the address of the reported burglary attempt, in the same direction as the two burglary suspects fled. The straight-line distance of the address of the attempted burglary from the point of the stop was approximately two blocks. The stop was made two or three minutes after Lavigne received the radio dispatch call concerning the attempted burglary.

Lavigne further testified that he had previously patrolled the Wolflin area at midnight and was familiar with traffic flow at that time and place. He indicated that there was "very, very little" traffic there at midnight. Lavigne stated that the vehicle he stopped was the only vehicle in the area. He testified that it was not unusual for burglary suspects to park a couple of blocks away from the building or residence where a burglary was to be committed, commit the burglary, and then go to the vehicle on foot and drive away. Lavigne agreed that there was nothing unusual about a car being driven in the neighborhood at that time of night, and that he did not "expect to see zero cars" [sic] under those circumstances. The vehicle was not stopped because it was in violation of any law.

By his Motion to Suppress Fruits of Illegal Detention, appellant asserted in the trial court that incriminating evidence acquired as a result of his illegal detention should be suppressed. Appellant did not assert in his Motion to Suppress that the extent of the search conducted following the stop was improper, nor does he so assert in this appeal. Nor did appellant cite Article I, Section 9 of the Texas Constitution as a basis for the motion to suppress. Appellant has not urged in this court that Article I, Section 9 of the Texas Constitution offers more protection to him than is provided by the United States Con-

stitution. *See Hulit v. State,* 982 S.W.2d 431 (Tex.Crim.App.1998) (Texas Constitution may offer less, more, or the same protections as the federal constitution). Thus, we consider appellant's sole point of error to be asserting the search and seizure protective standards established by the Fourth Amendment of the federal constitution in regard to the making of a vehicle stop for investigative purposes. Tex.R.App. P. 38.1(e).

## LAW

■ In reviewing a trial court's ruling, appellate courts afford almost total deference to the trial court's determination of historical facts that the record supports, especially when the trial court's findings are based on credibility. *Guzman v. State,* 955 S.W.2d 85 (Tex.Crim.App.1997). However, if the resolution of ultimate questions does not turn on an evaluation of credibility and demeanor, appellate courts review mixed questions of law and fact *de novo.*[1] *Id.* at 89. Detention and reasonable suspicion are by nature legal concepts and are properly subject to *de novo* review. *Hunter v. State,* 955 S.W.2d 102, 107 (Tex.Crim. App.1997); *see also Loesch v. State,* 979 S.W.2d 47, 50–51 (Tex.App.—Corpus Christi 1998, no pet. h.) (whether facts recited by police officers gave rise to a reasonable suspicion is a question reviewed *de novo* ).

The Fourth Amendment to the United States Constitution protects persons from unreasonable searches and seizures. *See Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669, 1680 (1960); *Davis v. State,* 947 S.W.2d 240, 244 (Tex. Crim.App.1997); *Giacona v. State,* 372 S.W.2d 328, 333 (Tex.Crim.App.1962), *cert. denied,* 375 U.S. 843, 84 S.Ct. 92, 11 L.Ed.2d 70 (1963). We follow the guidance of the United States Supreme Court when interpreting the federal constitution.

---

1. A question "turns" on an evaluation of credibility and demeanor when the testimony of one or more witnesses, if believed, is enough to add up to what is needed to decide the substantive issue. *Loserth v. State,* 963 S.W.2d 770, 773 (Tex.Crim.App.1998) (citing *Hunter v. State,* 955 S.W.2d 102, 105 n. 4 (Tex.Crim.App.1997)).

*State v. Guzman,* 959 S.W.2d 631, 633 (Tex.Crim.App.1998).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a police officer can briefly detain a person and "search" that person by a patdown of the outer surfaces of the clothing in the course of investigating suspicious activity if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. The officer must be able to point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant the level of intrusion into the citizen's personal security. *Id.* at 21, 88 S.Ct. 1868; *see Davis v. State,* 947 S.W.2d at 242. The facts must support more than an inchoate and unparticularized hunch or suspicion, but are to be considered in light of the officer's experience. *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. 1868. While *Terry* dealt specifically with a "frisk" situation, a body of law has developed around what have become referred to as "investigative detentions." *See Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (a "stop" is a brief detention of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information); *U.S. v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628 (1981) (investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity); *U.S. v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1, 12 (1989) (the relevant inquiry is not whether the particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts).

Of particular relevance to standards by which we judge the matter before us are the U.S. Supreme Court cases of *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) and *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Both cases dealt with the legality under the Fourth Amendment of vehicular investigative stops. In *Brignoni–Ponce,* the U.S. Border Patrol stopped a vehicle to question its occupants about their citizenship and immigration status. The stop was part of a regular traffic-checking operation in Southern California, near the Mexican border. The stop was based on the observations of two border patrol officers that the vehicle stopped was occupied by three persons who appeared to be of Mexican descent. It turned out that the two passengers were aliens who had entered the country illegally. The driver was charged with and convicted of knowingly transporting illegal immigrants. The court of appeals reversed the conviction because the stop of the vehicle was based solely on the appearance of the occupants as being of Mexican ancestry, and such basis was not a "founded suspicion" that the occupants were illegal aliens. The court of appeals held the stop to have been illegal under the Fourth Amendment, even for the limited purpose of questioning the occupants of the vehicle.

The Supreme Court affirmed the court of appeals and held that the single factor of the apparent Mexican ancestry of the vehicle occupants was not reasonable grounds for the officers to believe the occupants of the vehicle were aliens. The Court noted that its prior opinions established the principle that in appropriate circumstances the Fourth Amendment allows a properly limited "seizure" on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. 422 U.S. at 881, 95 S.Ct. 2574. The Court then enunciated the test it used to evaluate the *Brignoni–Ponce* facts:

> [W]e hold that when an officer's observations lead him reasonably to *suspect* that a particular vehicle *may* contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inqui-

ry must be "reasonably related in scope to the justification for their initiation." (citation omitted). 422 U.S. at 881, 95 S.Ct. 2574. (emphasis added).

*Cortez* also involved border patrol agents. The *Cortez* officers discovered numerous foot tracks in a remote area. The tracks led from the Mexican border into the United States. The tracks terminated at a point next to Highway 86 in Arizona. The officers surmised that multiple groups of illegal immigrants passed along the route, were picked up at the highway and transported further into the United States. The officers set up surveillance of Highway 86 on a night they thought to be prime for entry of a party of illegal immigrants. The surveillance was out-of-sight of the anticipated pickup point on the highway, but in a position to monitor the type of vehicles that proceeded along the highway toward, and then returned from, the direction of the supposed pickup point. Multiple vehicles traveled Highway 86 while the officers observed the roadway. During the time frame the officers anticipated the pickup would be made, however, only one vehicle large enough to pick up and transport a group of people passed the officers driving toward the anticipated pickup point, then returned, heading away from the pickup point. The officers followed the vehicle, flashed their police lights, and intercepted the vehicle. The officers identified themselves, told the driver of the vehicle that they were conducting an immigration check, and asked if he was carrying any passengers in his camper. Cortez, the driver, opened the camper and six illegal aliens were discovered. Cortez and his passenger were charged with and convicted of transporting illegal aliens. The court of appeals reversed, holding that the officers lacked a sufficient basis to justify the stop of the vehicle.

The Supreme Court reversed the court of appeals and affirmed the legality of the investigative stop by the officers. The Court noted that the only issue was the legality of a stop for the limited purpose of questioning the occupants of the vehicle about their citizenship and immigration status and the reasons for the round trip to the area of the presumed pickup point in a short timespan in a virtually deserted area. The legality of the search following the stop of the vehicle was not questioned by the defendants. In finding the investigatory stop legal, the Court stated the two elements necessary for a stop to be permissible: first, all the circumstances and evidence must be considered, not in terms of "library analysis by scholars," but as understood by those versed in the field of law enforcement; and second, consideration of all the circumstances must show that the officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. 449 U.S.at 417–18, 101 S.Ct. 690. The circumstances to be considered, according to *Cortez*, include "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *Id.* From such data the trained officers may permissibly draw inferences and make deductions that might well elude an untrained person. *Id.* In applying its analysis to the *Cortez* facts and circumstances, the Court determined that the stop did not violate the Fourth Amendment:

> [T]he question is whether, based upon the whole picture, [the agents], as experienced Border Patrol officers, *could* reasonably surmise that the particular vehicle they stopped was engaged in criminal activity. On this record, they could so conclude. 449 U.S. at 421–22, 101 S.Ct. 690. (emphasis added)

Prior to 1997, Texas caselaw required the State to justify an investigative stop or detention by proving that the actions of the detainee were more consistent with criminal activity than with innocent activity. *Armstrong v. State,* 550 S.W.2d 25 (Tex.Crim.App.1976). In *Woods v. State,* 956 S.W.2d 33 (Tex.Crim.App.1997), the

Court of Criminal Appeals overruled *Armstrong* insofar as *Armstrong* established the "more consistent with criminal activity than innocent activity" test for determining whether an investigative stop was based on reasonable suspicion. The State asserted in *Woods* that the *Armstrong* test erroneously required the State to prove by a preponderance of the evidence that the basis for an investigatory stop was consistent with criminal activity. The State contended that such a test was inconsistent with established U.S. Supreme Court authority for investigatory stops under the Fourth Amendment. The State also asserted that Texas caselaw subsequent to *Armstrong* negated the requirement of proof of activity consistent with criminal conduct by a preponderance of the evidence before an investigatory stop would be legal. *Woods v. State*, 956 S.W.2d at 34–5. *Woods* specifically overruled the *Armstrong* standard and adopted the less restrictive "reasonable suspicion" standard for investigative stops:

> The Fourth Amendment bridles the government's power to invade a person's privacy by requiring that searches and seizures customarily be supported by a showing of probable cause. *The lower standard of reasonable suspicion* is derived from the probable cause standard and applies only to those brief detentions which fall short of being fullscale searches and seizures ... [We] follow the guidance of the Supreme Court in *Cortez* and *Sokolow* ... We hold that the reasonableness of a temporary detention must be examined in terms of the totality of the circumstances and will be justified when the detaining officer has specific articulable facts, which taken together with rational inferences from those facts, lead him to conclude that the person detained actually is, has been, or soon will be engaged in criminal activity. 956 S.W.2d at 35, 38. (emphasis added)

Two Texas cases have factual bases with similarities to the case before us. In *Brooks v. State*, 830 S.W.2d 817 (Tex. App.—Houston [1st Dist.] 1992, no pet.) the court of appeals affirmed the trial court's refusal to suppress evidence obtained pursuant to an investigative detention. Responding to a reported burglary in progress at an apartment, police witnessed the defendant driving out of the complex. An officer stopped the defendant to inquire what he was doing at the reported burglary scene, ran a driver's license check, and found the defendant had outstanding warrants. The appellate court concluded that under the facts, the stop was not illegal. In *Brooks*, officers were able to articulate that (1) a burglary in progress was reported at a certain location, (2) the defendant was seen driving from the area as officers arrived, and (3) based on the experience of the officers, it was not uncommon for burglary suspects to be leaving or even be gone when officers arrived.

In *Flores v. State*, 967 S.W.2d 481 (Tex. App.-Houston [14th Dist.] 1998, no pet.), defendant's vehicle was stopped by a police officer as it was exiting the parking lot of a bar. The officer who stopped the vehicle had responded to a reported assault. The officer stopped the vehicle because several Hispanic juveniles were in it. The officer did not stop the vehicle because she suspected the occupants of participating in the assault she was responding to, but rather because she recalled that some detectives believed a rash of burglaries had been committed by Hispanic juveniles. The officer, therefore, determined to investigate why the Hispanic juveniles in the vehicle were out so late at night in an adult bar parking lot and to see if they had been involved in burglary activity. After the stop and as the officer approached the stopped vehicle, she recognized the defendant as having been reportedly involved in an earlier disturbance, and the vehicle as having been stolen in the earlier disturbance. Defendant Flores was charged with unauthorized use of a motor vehicle. He moved to suppress all of the evidence seized as a result of the stop of the vehicle.

He claimed the stop was illegal, therefore the subsequent search and seizure was illegal, and the fruits of the stop, search and seizure should be suppressed. The trial court denied the motion to suppress and the court of appeals affirmed. The court of appeals found the stop reasonable based on the specific articulable factors that (1) the officer was responding to a reported crime (assault); (2) defendant's vehicle was departing the area where the assault had been reported; (3) it was unusual for a group of juveniles to be located in the parking lot of an adult establishment so late at night; and (4) the officer recalled that some department detectives believed a rash of burglaries was attributable to Hispanic juveniles. 967 S.W.2d at 484.

## ANALYSIS

■ The State must justify a warrantless investigatory stop by proof.[2] Officers effecting an investigatory stop must be acting on more than an inchoate and unparticularized suspicion or "hunch" that the detainee was, is or shortly will be involved in criminal activity. *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. 1868; *Woods v. State,* 956 S.W.2d at 35 (citing *Terry* ). The officers' required level of certainty need not rise to the point that a preponderance of the circumstances known to the officers support the suspicion that the detainee was, is or shortly will be involved in criminal activity. *See Woods v. State,* 956 S.W.2d at 38. Nor are the officers required to have been acting under circumstances sufficient to establish that the detention was based on probable cause to believe that the detainee was, is or shortly will be involved in criminal activity. *Id.* at 35. The same standards apply to detention of a vehicle stopped or detained by the authorities. *United States v. Cortez,* 449 U.S. at 421–22, 101 S.Ct. 690.

■ The reasonableness of the investigatory detention of appellant is judged in terms of the totality of the circumstances, including the objective observations of Lavigne, police reports available to him (including the dispatch radio call), the modes or patterns of operation of certain kinds of lawbreakers, and the inferences and deductions that were made by Lavigne as a police officer with thirteen years of experience and prior patrol experience in the neighborhood where the crime was reported and where appellant was stopped. *United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. 690. The investigatory detention will be justified if Lavigne had specific articulable facts, which when taken together with rational inferences and deductions he could make from those facts based on his experience, could reasonably have led him to suspect that the appellant had been involved in the reported attempted burglary. *See United States v. Cortez,* 449 U.S. at 421–22, 101 S.Ct. 690; *United States v. Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. 2574; *Woods v. State,* 956 S.W.2d at 38. We must be mindful that Lavigne was *investigating* a reported crime. His stop of the vehicle occupied by appellant was to investigate and to gather information about persons who *might* have been involved in a crime that had already occurred. *United States v. Brignoni–Ponce,* 422 at 881, 95 S.Ct. 2574. Such an investigatory stop is not in violation of the Fourth Amendment if Lavigne's mind-set toward the particular occupants of appellant's vehicle as *possibly* having been involved in the attempted burglary was based on specific articulable factors, and was such as *could* have been reached by a reasonable person so situated as was Lavigne. *United States v. Cortez,* 449 U.S. at 421–22, 101 S.Ct. 690.

The facts of both *Brooks* and *Flores* have striking similarities to the facts in appellant's situation. All three factual bases involve officers responding to re-

**2.** Appellant did not prove in the suppression hearing that he was stopped without the State having a warrant. Neither appellant nor the State has raised the issue of the lack of proof of a warrant by appellant and we do not address that question.

ports of crime. In all three situations the officers observed vehicles departing the area of the reported crime. In none of the cases were the occupants of the vehicles identified as having been at the very location where the reported crime took place before their vehicles were stopped. In each case one of the factors in the officer's decision to stop the vehicle for investigative purposes was that the vehicle was located in proximity to the scene of a reported crime. In none of the cases did the defendant complain that either the extent or duration of the investigative procedure following the stop was excessive.

Appellant's vehicle was two to three blocks from the scene of the reported crime. At the time Lavigne stopped appellant's vehicle, appellant was not engaged in unusual or surprising activity which would, in and of itself, support a reasonable suspicion that appellant was, had been, or was about to be engaged in criminal activity. Our consideration of the totality of the circumstances, however, is not from the viewpoint of appellant, nor from the vantage point of a disinterested third party looking only at objective events. We must consider the information and circumstances known to Lavigne from the viewpoint of Lavigne as an experienced officer when he encountered appellant and his companion in their automobile, departing the area of the previously-reported crime. *Woods v. State*, 956 S.W.2d at 38; *see United States v. Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690; *United States v. Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574; *Terry v. Ohio*, 392 U.S. at 23, 27, 88 S.Ct. 1868.

Whether Lavigne's thoughts that the occupants of appellant's automobile may have been involved in the crime he was dispatched to investigate are labeled as a "hunch" or a "suspicion" does not control our evaluation. The controlling determination is whether, evaluating the circumstances as an officer with Lavigne's experience and knowledge would evaluate them, and based upon specific articulable factors,

a reasonably prudent man could suspect that the appellant's vehicle or its occupants may have been engaged in criminal activity. The following specific articulable factors support Lavigne's suspicion that the occupants of appellant's automobile may have been involved in criminal activity: (1) Lavigne received and responded to the dispatch call shortly before midnight, a time of day when according to his prior experiences there was "very, very little" traffic in the Wolflin area; (2) the dispatch call reported an attempted burglary in an area that had been the scene of multiple recent burglaries; (3) two suspects were reportedly involved in the attempted burglary; (4) the persons attempting the burglary had departed in a northerly direction; (5) Lavigne believed that burglars often parked a getaway car a short distance from the residence or building to be broken into, and proceeded to their parked car on foot after the crime; (6) Lavigne encountered appellant's vehicle no more than two to three minutes after receiving the dispatch call for the attempted burglary; (7) he observed no other cars in the area before (or after) he encountered appellant's vehicle; (8) appellant's vehicle contained two persons, the same number as had been reportedly involved in the crime; (9) appellant's vehicle was heading away from the address where the crime had occurred; (10) appellant's vehicle was headed in the same direction that the burglary suspects fled on foot from the scene of the burglary attempt; and (11) appellant's vehicle was only three to four blocks driving distance (approximately two blocks straight-line distance) from the scene of the burglary when Lavigne stopped the vehicle.

We conclude that under the totality of the circumstances in this case, Lavigne's suspicion that the occupants of appellant's vehicle could have been involved in illegal activity was reasonable and was based on articulable facts and circumstances. The trial court did not err in denying appellant's motion to suppress. Appellant's sole

point of error is overruled. The judgment of the trial court is affirmed.

QUINN, J., dissenting.

BRIAN QUINN, Justice, dissenting.

I respectfully dissent from the majority's opinion. The circumstances upon which it relied, when viewed in their totality, and coupled with the rational inferences therefrom, cannot support the conclusion that Stephen Christian Sanders had, was, or was about to be engaged in unusual, much less criminal, activity. The only rational conclusion which I can draw from the record is that someone may have been involved in criminal conduct at some time or another in the same neighborhood through which appellant happened to be driving. Such does not amount to reasonable suspicion. That this is the only logical interpretation of the record is best illustrated by an analysis of the record and factors cited by the majority.

### Standard of Review

Before turning to the record, I am compelled to discuss my frame of reference. Reasonable suspicion depends upon the totality of the circumstances existent prior to the officer engaging in the detention. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim.App.1997). Those circumstances are viewed from the perspective of a mythic reasonable man present at the scene. *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 118 S.Ct. 236, 139 L.Ed.2d 167 (1997); *see Davis v. State*, 947 S.W.2d 240, 242–43 (Tex.Crim.App.1997) (applying an objective test focusing upon the facts available from the perspective of a "man of reasonable caution"). At the very least, those circumstances must consist of specific articulable facts which, when taken together with rational inferences therefrom, lead that mythic man to conclude that the person detained "actually is, has been, or soon will be engaged in criminal activity." *Woods v. State*, 956 S.W.2d at 38. In other words, the articulable facts must be enough to permit one to rationally conclude that the person stopped "actually is" linked to the potential criminal activity. *Id.; Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979) (involving probable cause, but nevertheless recognizing that it must be "particularized with respect to [the] person" in question).

It is not enough that the detainee merely be in the geographic area wherein criminal activity occurs or occurred. *Id.* Again, not only must the detainee be reasonably linked to the activity, *id.*, but the indicia relied upon to justify the stop must exist beforehand. *Woods v. State*, 956 S.W.2d at 38; *Flores v. State*, 967 S.W.2d 481, 484 (Tex.App.—Houston [14th Dist.] 1998, no pet.).

Additionally, while *Woods* dispensed with the " 'as consistent with innocent activity as with criminal activity' construct,' " 956 S.W.2d at 38, that does not grant the officer carte blanche to detain someone for engaging in purely innocent conduct. If this were not true, then everyone out in the public would be susceptible to being stopped and frisked, as suggested by Judge Overstreet in his dissent in *Woods*. *Id.* at 39 (dissenting opinion). Further, I do not believe that such was what the majority in *Woods* intended. Rather, while the circumstances unfolding and acts perceived by the officer may be innocent, they must nevertheless reasonably suggest that "there is something out of the ordinary occurring" which is related to a crime. *Davis v. State*, 947 S.W.2d at 244. More importantly, if the activity cannot be so construed from the perspective of the reasonable man, then neither the officer's hunch nor speculation can fill the void. *See id.* at 243 n. 3 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968) (recognizing that hunch or speculation is not enough basis for reasonable suspicion). Nor can inference arising from an officer's ever-changing experience suffice in the absence of facts indicating unusual activity.

Finally, because the officer at bar seized appellant without a warrant, the burden lay with the State to prove the validity of the seizure.[1]  *Russell v. State,* 717 S.W.2d 7, 9–10 (Tex.Crim.App.1986).  Thus, it was incumbent upon the prosecutor to elicit from the witnesses evidence of the articulable facts founding the seizing officer's claim of reasonable suspicion.  With this said, I now turn to the record at bar.

### Application of Standard to Evidence of Record

Officer LaVigne received a dispatch around midnight instructing him to proceed to 2835 Bowie to investigate an attempted burglary.  He was told that the suspects were two males with flashlights and running on foot in a northerly direction down an alley.  According to the officer, the dispatcher said nothing else.  Officer LaVigne had no information about the purported suspects' 1) age (whether juveniles or adults), 2) race, 3) nationality, or 4) physical characteristics.  Similarly unmentioned by the dispatcher and unknown to LaVigne was anything about the suspects' use of a vehicle in the attempted burglary or to make their escape.  Nevertheless, within two minutes of hearing the dispatch that two men were running away, LaVigne spied a car containing "two peo-

ple" and heading away from the "general direction" of 2835 Bowie.  Though neither occupant of the car was seen running down the street or violating any traffic regulation or acting in an unusual manner, according to LaVigne, he decided to stop and detain them.  His reasons for doing so were: 1) a "hunch" that appellant and his passenger were the suspected burglars, 2) the number of occupants within the car, 3) its general direction, 4) its relative proximity to the site of the supposed crime, 5) the brief time lapse between receiving the call and seeing the car, 6) the absence of any other vehicles in the neighborhood, which is noted for little traffic at midnight, and 7) his supposition that potential burglars have cars parked somewhere nearby.  Although these indicia appear many, their analysis and sum do not support the existence of reasonable suspicion.

The first indicia considered, and that which I believe to be most important given the circumstances involved, is that of time.[2]  Again, Officer LaVigne testified that less than two minutes had lapsed between receiving the dispatch and seeing appellant.  Though he and the majority place emphasis on this brief time lapse, in actuality it means nothing without its antecedent.  The antecedent to which I refer is the time between the call to the police

---

1.  The majority insinuates that this is inaccurate because no one proved that the officer stopped appellant without a warrant.  Yet, that he had no warrant is obvious from the facts of the case.  First, the seizure in question was allegedly a *Terry* stop, which does not necessitate a warrant.  This, coupled with the fact that the State endeavored to validate the seizure pursuant to *Terry,* would allow one to rationally infer from the record that no warrant was involved.  Nevertheless, more evidence *exists* bolstering *my conclusion.* For instance, the officer who eventually seized appellant testified that he proceeded to the area where the burglary allegedly occurred upon receiving the dispatch to do so, not to his own office nor that of the prosecutor to obtain an affidavit supporting issuance of a warrant nor to that of a neutral magistrate to obtain a warrant.  So too did the officer testify that he arrived in the neighborhood within two minutes of the radio broadcast, hardly time within which to draft an

affidavit prerequisite to obtaining an arrest warrant and to trouble the magistrate for the warrant.  In sum, the record sufficiently illustrates not only that the officer lacked a warrant when he seized appellant but also that the State had the burden to justify the stop.

2.  I deem this factor to be of utmost importance because of the absence of a substantive description of the burglary suspects.  When an officer does not know who he is looking for, what that person looks like, or whether the suspect even has a car to make his getaway, the likelihood of his capturing the right person is dependent upon the officer's arriving upon the scene or its immediate vicinity to observe the presence of the unknown person.  In that case, the person's proximity to the crime scene increases the probability that he is the one who is involved in the crime or unordinary activity.

initially reporting the supposed burglary and the dispatch to LaVigne. The record is completely silent on that period. Whether an hour passed is unknown, as is whether a minute passed. And, to the extent that finding an individual within the vicinity of a crime scene somehow links him to the crime, logic dictates that the strength of the link is inversely related to the passage of time. That is, the more time that lapsed between the initial call to the police and the dispatch, the less the likelihood that someone found in the area would be linked to the crime. This is especially true when, as here, the party committing the crime was last seen rapidly fleeing the area. Therefore, because the record fails to show what this antecedent time period was, it matters little how quickly the officer saw appellant in the area upon receiving the call.

Next, authority and logic indicate that proximity to a crime scene may be a factor influencing the existence of reasonable suspicion. Indeed, the majority cites case law, e.g., *Brooks v. State*, 830 S.W.2d 817 (Tex.App.—Houston [1st Dist.] 1992, no pet.), supporting the view. Yet in *Brooks*, the pertinent indicia consisted of: 1) a report that the burglary was "in-progress," 2) the officer seeing the suspect at the apartment complex where the burglary was occurring, and 3) the suspect attempting to drive away as the officer approached him. *Id.* at 819. To the extent that the suspect's proximity to the crime was of importance, it was so because the suspect was in the "immediate area of a burglary in progress," that is, the suspect was at the actual site of the complex where the burglary was occurring. *Id.* at 821. At bar, however, appellant was not seen at the site of the burglary, as was the appellant in *Brooks*. Nor was there a "burglary in progress" here, as there was in *Brooks;* our burglars were seen fleeing before the

crime was reported to the police. Nor did our appellant attempt to evade the investigating officer, as did the one in *Brooks*. Thus, as can be readily seen, *Brooks* involved much more than mere proximity. It encompassed indicia which are totally absent here.

Additionally, the closest point to the scene at which the officer could place our appellant was three to four blocks away. How close this actually was to the purported crime scene is unknown, given the record before us. No one testified about the length on any particular block. Whether they were 50 feet long or 1000 is open for conjecture, and we cannot answer the question by merely choosing a particular length.[3] Simply put, a block is not a block is not a block. They vary in size depending upon the whim of the developer and the governmental entity approving the plat which demarcates them. So, it is rather suspect to say that appellant was found in the vicinity of the supposed crime when the record fails to show how close he actually was and the amount of time which passed between the report to the police department and the officer's arrival in the area.

That the area was known for little traffic at midnight was also a factor relied upon by both the officer and majority. Yet, I cannot see how appellant's driving in the neighborhood is indicative of unusual activity. Indeed, the officer himself said that he would expect to see some cars in the neighborhood at that hour, though not many. That is exactly what he saw; few cars in the neighborhood. Thus, seeing the neighborhood in just the way one expects can hardly be indicative of unusual activity linking someone to a crime. And, just maybe that is why the officer conceded (which concession the majority recognized) that there was nothing unusual

---

3. The majority attempts to minimize this absence of actual geographic measurement by stating that the distance consisted of only two blocks if one were to draw a straight line between the house where the burglary attempt supposedly happened and the stop occurred. However, this effort still fails to inform us of the size of the blocks or provide an accurate depiction of the distance involved.

about a car being driven there at that time.

The officer and the majority also make much of the premise that the officer's experience indicated that burglars parked cars near crime scenes to make their escape.[4] Yet, there is no evidence of a car being used by the supposed burglars here. There is no evidence of anyone hearing a car start or drive away after the attempted burglary. There is no testimony about anyone seeing a car parked in the vicinity, not even from Officer LaVigne who supposedly was assigned to patrol the area prior to receiving the dispatch.[5] Nor is there a smattering of evidence, as mentioned *infra*, that these supposed burglars were even old enough to have, much less drive, a car. Again, no one informed Officer LaVigne of the potential age, race, ethnicity, or physical characteristics of those whom he sought. Nor is there evidence that when he first saw appellant and his companion in the car he recognized them as two males, as opposed to two females, or a male and female. He merely described those he saw (when he first saw them) as two "people."[6]

Unlike the plethora of cases in which a momentary stop was upheld, there is no evidence at bar of appellant performing a furtive gesture in the presence of Officer LaVigne, of appellant attempting to flee the scene, of appellant being seen at the location of the criminal act, of appellant committing any criminal violation or even acting in an unordinary manner in the presence of the officer, of appellant driving in any questionable manner, or even of appellant being seen possessing a flashlight or other tools utilized by a burglar prior to the stop.[7] *See, e.g., Terry v. Ohio,* 392 U.S. at 5–7, 88 S.Ct. at 1871–72, 20 L.Ed.2d at 896–98 (wherein the officer actually saw the suspects acting unusually by "casing" a store); *Davis v. State,* 794 S.W.2d 123, 126 (Tex.App.—Austin 1990, pet. ref'd) (wherein the defendant's "suspicious movements" were consistent with participation in drug transaction); *James v. State,* 629 S.W.2d 92, 93 (Tex.App.—

**4.** What the officer actually said was that "it's not unusual for burglary suspects to park [a car] a couple of blocks away, commit the crime, go back to their vehicle with the goods and leave." Interestingly, no one tested this supposition by asking the officer how many burglaries he had experienced wherein the suspect carried booty such as televisions, stereos, and the like under his arm for a "couple of blocks" to effectuate his escape in a motor vehicle. Nevertheless, to simply act upon his avowed "hunch" and stop the first car he saw, the officer undoubtedly rejected the likelihood that the suspected burglars remained afoot, were too young to own or operate a car, or were merely neighborhood pranksters afoot terrorizing their neighbors.

**5.** Interestingly, if the area was as small as the majority, prosecutor, and officer want the reader to believe, one could reasonably ask why the officer did not see a strange car parked in the area. After all, the officer indicated that a spate of burglaries had been occurring in the neighborhood and that he was patrolling it for that reason.

**6.** That burglars drive cars means nothing when considered in the context of the standard of review. While *Woods* holds that the

indicia relied upon need not be inherently criminal, it must nevertheless be unusual or unordinary. Given this, I am left to question how the inference that burglars drive cars evinces unusual activity since most everyone in our society old enough to drive a car does so. Indeed, it is just as reasonable to conclude that burglars live in houses. Would that provide indicia to allow the officer to detain those living in the houses within a four block radius of 2835 Bowie? After all, burglars have houses and the houses holding the potential detainees would be in the same proximity of 2835 Bowie as was appellant. Though I submit that the answer is no, the manner of deduction utilized by the officer and approved by the majority would suggest an affirmative response.

**7.** I concede that discovery of burglar's tools is something more likely to occur after an investigative detention and, if so discovered, would not support the initial detention. It is worth noting, however, that the record lacks any indication that such tools were recovered from appellant, despite the report that the burglary suspects carried flashlights. This further demonstrates the minimal value and accuracy of a police officer acting upon a "hunch."

Dallas 1981, pet. ref'd), *overruled on other grounds by Woods v. State*, 956 S.W.2d 33 (Tex.Crim.App.1997) (wherein the defendant walked away from an area of suspected crime at rapid pace and then entered car and drove away at excessive speed); *Bobo v. State*, 805 S.W.2d 493, 496 (Tex. App.—Houston [14th Dist.] 1991), *rev'd in part on other grounds*, 843 S.W.2d 572 (Tex.Crim.App.1992) (wherein the defendant and other occupant of vehicle, which officers observed running stop sign, matched description of "'suspicious individuals'" reported earlier); *Reyes v. State*, 910 S.W.2d 585, 590 (Tex.App.—Amarillo 1995, pet. ref'd) (wherein an automobile drove away from an area of suspected crime at high rate of speed and failed to stop at stop sign).

Not even do the cases which the majority believe highly analogous permit detention and frisk on the basis of the *de minimis* criteria present here, since each has more. As previously noted, in *Brooks v. State, supra*, the burglary was said to be "in-progress," the detainee was found on the grounds of the apartment complex being burglarized, and the detained tried to flee as the police approached. None of these factors were present here. In *Flores v. State, supra*, the officer had information about the age and ethnicity of the purported burglars and compared that information to the physical characteristics of those she stopped. 967 S.W.2d at 484. Yet, Officer LaVigne had nothing akin to that. His dispatcher simply told him that the suspects were "two males." Whether those two males were white, black, brown, or puce or 10, 15, 20, 30, 50, or 80 years of age went utterly unmentioned to, and unknown by, him. Furthermore, the officer in *Flores* also relied upon (and the appellate court also found persuasive) the facts that: 1) the detainees were juveniles, 2) these juveniles were in the parking lot of a bar; an establishment open only to adults, and 3) the detainees tried to evade the officer. *Id.* Yet again, none of those indicia were present at bar. We only have evidence of adults driving in a normal manner, through a neighborhood wherein adults live, at a time when adults would be expected to be outside, and stopping when directed to stop. Simply put, our circumstances are not comparable to those in *Flores*.

Nor is our situation akin to that in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), another case relied upon by the majority. Unlike the circumstances in *Cortez*, we have no officer who set up surveillance of the area or who monitored the ingress and egress of a specific type of vehicle. Nor do we have a vehicle: 1) meeting the predetermined specifications, 2) being seen by a law enforcement officer conducting surveillance, 3) traveling to and from an abandoned location having little purpose other than one involving criminal activity, or 4) returning from that location within a known time frame, which time frame happened to coincide with that estimated by the officer as the time needed by Cortez to sojourn to the crime scene and commit the particular criminal act. In effect, the officers in *Cortez* saw their prospective detainee participate in unusual conduct. Our officer did not. He not only failed to see appellant do anything unusual but also admitted that appellant had not done anything unordinary.

The majority's caveat about being "mindful that officer LaVigne was *investigating* a reported crime" and that his "stop of the vehicle ... was to investigate and to gather information about persons who *might* have been involved in a crime that had already occurred" does not justify the stop. Its statement can only be interpreted in either of two ways. The first is that an officer who is investigating a crime can stop anyone as long as he is investigating a crime. The second is that an officer can stop anyone he chooses in order to investigate and gather information about some person who *"might"* have been involved in a crime that occurred. Yet, neither interpretation comports with the law. Simply put, an officer cannot lawfully seize

and temporarily interrogate anyone just because a crime occurred. Rather, before the stop is lawful, he must have reasonable suspicion, based on pre-existing articulable facts, illustrating that the person to be seized is linked to the unordinary or criminal activity he is investigating. *Woods v. State, supra; Ybarra v. Illinois, supra.* In other words, there must be a nexus between the person stopped and the unordinary or criminal activity and the nexus must illustrate that the person stopped is involved in the criminal or unordinary activity. That the officer is merely investigating a crime does not establish the requisite link or justify a completely random stop.

The record before me merely illustrates that an officer, who candidly admitted to acting on a "hunch," decided to stop the first and only car he saw proceeding in an orderly and lawful fashion. Despite having no physical description of the suspects, despite knowing that the suspects he sought were afoot, and despite knowing that appellant had acted in an ordinary lawful way, the officer acted as he did because the car was in a neighborhood at an hour when he expected to see some but not many cars, because the car had two "people" in it, because the car was heading in the same polar direction as the two males who were seen running away sometime earlier that night (how much earlier was and is unknown), and because the car was in the same neighborhood where someone reported an attempted burglary that occurred at sometime or another that night. I find this to be far short of the articulable facts necessary for a mythic reasonable man to suspect that appellant was involved in unusual activity relating to crime. What I do find it to be is nothing more than an officer acting upon a hunch and stopping the first vehicle he saw, contrary to *Rhodes, Davis, Woods,* and *Ybarra.* It was the State's burden to prove the reasonableness of the officer's stop, *Russell v. State,* 717 S.W.2d at 9–10, and it did not.

The majority opinion here, and that in *Glenn v. State,* 967 S.W.2d 467 (Tex. App.—Amarillo 1998, pet. dismissed as improvidently granted), provide an interesting scenario. Now, an utterly innocent person who happens to be driving through a neighborhood where crime has occurred may be stopped, bodily frisked, and briefly interrogated. During the interrogation, the officer may ask for consent to search the detainee's vehicle. If consent is refused, the officer can place this innocent person into a locked squad car for at least three-quarters of an hour while the officer obtains the means necessary to search the vehicle without entering it (such as through the use of a drug dog) in an effort to find evidence that would give him probable cause to arrest the innocent person. It is doubtful that a majority of our current criminal court of last resort in Texas will prevent such treatment of the innocent given its recent pronouncements on search and seizure. I find this quite spooky.

In sum, the Fourth Amendment is the standard to which police conduct must conform. It is not to be conformed to police conduct. Unfortunately, I believe that is what is occurring of late. Due to the fear of crime, the judiciary slowly succumbs to public pressure and chisels away at the bastion protecting the innocent from overzealous governance. With this opinion, we have gone from a situation where a brief investigatory detention is permitted because an officer sees someone commit strange acts that are consistent with criminal behavior to one where anyone can be searched for merely being in a neighborhood where a crime occurred at some time or another. While the former circumstances evince reasonable suspicion to stop and frisk, the latter do not. Thus, I vote to prevent the government from intruding upon one's privacy based upon *de minimis* factors like those here and to reverse the order denying appellant's motion to suppress and the judgment convicting him of criminal misconduct.