**Stephen Christian SANDERS,
Appellant,**

v.

**The STATE of Texas.**

**No. 1131–99.**

Court of Criminal Appeals of Texas.

Dec. 15, 1999.

MEYERS, J., delivered a dissenting opinion to refusal of appellant's petition for discretionary review in which JOHNSON, J., joined.

This case presents a valuable opportunity to clarify the quantum of cause necessary to justify an investigative detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Given this Court's recent mandate instructing Texas appellate courts to review such Fourth Amendment claims *de novo, see Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997), it is even more important to seize this opportunity to further delineate the contours of the doctrine of "reasonable suspicion." By all accounts, that doctrine presents an "elusive concept." *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The line demarcating where a "particularized suspicion" begins and an "inarticulate hunch" ends is a fuzzy one. Appellant's petition presents a case which lies very close to, if not over, that line. It is also a case that deserves to be briefed and argued before this Court. It is these borderline cases which inform and define the concept of reasonable suspicion as a whole. *See Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996) ("[T]he legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of,

and to clarify the legal principles"). I dissent to the Court's refusal to grant Appellant's Petition for Discretionary Review.

On February 4, 1998, Officer David La-Vigne was one of several police officers patrolling the Wolflin area of Amarillo, where there had been numerous burglaries. The officers had been assigned "to flood the area ... to see if [they] could catch the burglars." Around midnight, a police dispatcher advised LaVigne of an attempted burglary in the area. LaVigne was told *only* that the attempted burglary involved two male subjects with flashlights who fled on foot northbound in an alley.

Approximately two or three minutes after the initial dispatch and roughly three or four blocks from the crime scene, LaVigne spotted a car containing "two people" heading away from the "general direction" of the burglarized residence. Although the driver did not violate any traffic laws and neither occupant acted in an unusual manner, La-Vigne decided to stop and detain them. He later testified that he did so for the following reasons: (1) he had a "hunch" that the appellant and his passenger were the suspected burglars; (2) there were two occupants in the car; (3) the car was headed northbound; (4) the car was within three or four blocks of the scene; (5) only two or three minutes had elapsed since he initially received the dispatch; (6) there were no other vehicles in the neighborhood, which had little traffic at midnight; and (7) he made a "common sense" supposition that burglars needed a means to escape the scene and that "it's not unusual for burglary suspects to park a couple of blocks away, commit the crime, go back to their vehicle with the goods and leave." Based on the stop, appellant was charged with possession of marijuana. Appellant moved to suppress the drugs as the fruit of an illegal detention. The trial court declined to suppress the evidence.

In a 2–1 decision, the Court of Appeals affirmed the trial court's ruling. *Sanders v. State,* 992 S.W.2d 742 (Tex.App.—Amarillo 1999). Although the majority noted that "appellant was not engaged in unusual or surprising activity which would, in and of itself, support a reasonable suspicion that appellant was ... engaged in criminal activity," *see id.* at 749, it found determinative certain language in Supreme Court opinions suggesting that "trained officers may permissibly draw inferences and make deductions that might well elude an untrained person." *Id.* at 746 (citing *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Based on Officer LaVigne's experience as a police officer, the majority concluded that the facts and circumstances were sufficient to justify his stop of the vehicle. *Id.* at 749.

In a vigorous dissent, Justice Quinn argued that the objective facts recited by Officer LaVigne did not add up to the existence of reasonable suspicion. *Id.* at 751 (Quinn, J., dissenting). Justice Quinn pointed out that, while Officer LaVigne may have responded quickly to the radio call, there was no testimony about the amount of time that intervened between the actual crime and the initial dispatch. *Id.* at 751–52. He also noted that appellant was not seen at the crime scene, as distinguished from the cases cited by the majority. *Id.* Moreover, he found nothing unusual in the fact that appellant happened to be driving through the neighborhood at midnight. *Id.* Finally, he pointed out that Officer LaVigne stopped appellant's vehicle in spite of the fact that he had no physical description of the burglary suspects—the officer did not know the age, race, ethnicity, or any physical characteristics of those whom he sought, nor did he appear to know the gender of the occupants of the car until after he stopped appellant's vehicle. *Id.* at 753. In sum, Justice Quinn suggested:

> the officer acted as he did because the car was in a neighborhood at an hour when he expected to see some but not many cars, because the car had two 'people' in it, because the car was heading in the same polar direction as the two males who were seen running away sometime earlier that night (how much earlier was and is unknown), and because the car was in the same neighborhood where someone reported an attempted burglary that occurred at sometime or another that night.

*Id.* at 754. The dissent concluded that these circumstances presented nothing more than an officer acting on a hunch and stopping the first vehicle that he saw. *Id.*

The majority found special significance in our previous observation that reasonable suspicion is a "lower standard" than the traditional showing of probable cause. *See id.* at 747 (quoting *Woods v. State,* 956 S.W.2d 33, 35 (Tex.Crim.App.1997)). However, the majority's opinion never compared precedent in which the "lower standard" of reasonable suspicion was found to have a floor. For example, in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), a unanimous Supreme Court indicated that a vague suspicion was not enough to justify a *Terry* stop. In *Brown,* officers observed the defendant and another man walking in opposite directions away from one another in an alley located in an area frequented by drug users. *Id.* at 48–9, 99 S.Ct. at 2639. Although the officers never saw the two men meet, one officer testified that he believed the two men had been together or were about to meet when the officers appeared. *Id.* The officers then stopped the defendant and asked him to identify himself and explain what he was doing there. *Id.* The officers articulated the following reasons to justify the stop under *Terry:* (1) the defendant was walking in an area that had a "high incidence of drug traffic"; (2) he "looked suspicious"; and (3) he had not been seen in that area previously by the officers. *Id.* In holding that the stop was an unreasonable seizure under the Fourth Amendment, the Court recognized that a person may be stopped only if the officers have a "reasonable suspicion, *based on objective facts,* that the individual

is involved in criminal activity." *Id.* at 51, 99 S.Ct. at 2641 (emphasis added). The Court emphasized that there was "no indication in the record that it was unusual for people to be in the alley" and "[t]he fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct." *Id.* at 52, 99 S.Ct. at 2641. Thus, the *Brown* Court was unwilling to allow the officers' experience in law enforcement and knowledge of the neighborhood to act as a substitute for specific, objective facts which might implicate the defendant in criminal conduct.[1]

Appellant was stopped after he was observed driving through a neighborhood where a number of burglaries had previously occurred and where another had been reported. The Court of Appeals concluded that Officer LaVigne's experience in law enforcement supplemented the lack of objective facts and allowed him to make a deduction from the circumstances that appellant was involved in the burglary. The facts of this case are close enough to warrant scrutiny of the appellate court's decision. Appellant's Petition for Discretionary Review should be granted, and the issue briefed and argued by both sides. I dissent.

---

1. Certainly only a fairly modest degree of suspicion will be sufficient to justify an investigative detention under *Terry*. For instance, in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), relied on extensively by the Court of Appeals, Border Patrol agents did not observe any criminal conduct on the part driver of the vehicle that they stopped. However, in concluding that the officers drew valid deductions from the facts presented, the Court emphasized the extent of the investigation that preceded the stop. In *Cortez*, agents discovered, on numerous occasions, foot tracks in a remote area of the Arizona desert leading from the Mexican border to a specific stretch of highway. Officers also noted that one recurring shoeprint bore a distinctive design, which the agents surmised belonged to a guide who trafficked in illegal aliens. Moreover, the officers noted that the tracks led into and over obstacles that could have been avoided in daylight, leading officers to conclude that the groups generally traveled at night. Also distinctive was the pattern the tracks would follow—the group would always come within 50 to 75 yards of the highway, then turn right and walk eastward, parallel to the road. Then, at roughly the same spot each time, the tracks would turn north and disappear onto the highway. The officers concluded that the aliens were likely being picked up by a vehicle approaching from the east, and then, after the pickup, returning from the direction from which it came. Based on this information, officers set up surveillance at a point where they could observe traffic coming and going from the pickup point. They also chose a night and time which their investigation and experience led them to believe would be the most likely time for aliens to cross the border. During the time frame officers anticipated the pickup would be made, they observed only one vehicle large enough to carry a group of people pass them going west and, a short time later, return to the east. The interval between when the appellant's vehicle initially passed the officers and when the officers spotted the truck returning from the pickup point was almost exactly the amount of time the agents had estimated it would take to make a round-trip to the pickup point. The agents therefore stopped the appellant's vehicle and discovered illegal aliens hiding inside. The Supreme Court concluded that on the facts presented, experienced Border Patrol agents could reasonably surmise that appellant's vehicle was engaged in criminal activity. *Id.* at 422, 101 S.Ct. at 697. The Court continued to emphasize, however, that all of the officers' deductions were drawn from a series of "objective facts" that, when combined to form a complete picture, suggested a distinct pattern of criminal behavior on the part of a particular trafficker. *See id.* at 419–21, 101 S.Ct. at 696. Thus, the quantum of cause necessary to stop the vehicle was provided when the truck (1) was of a size to meet the officers' predetermined specifications; (2) was seen traveling to and from what the officers had determined was a pickup point for aliens crossing the border; (3) was driving at a time when officers determined was most likely for such a crossing; and (4) was observed returning at almost the exact time estimated by the officers to drive to the location and commit the crime. These facts allowed an experienced Border Patrol agent to deduce that the vehicle was involved in criminal activity.