NO. 07-01-0194-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JANUARY 29, 2002

_____

JOE L. MARTINEZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2000-434418; HONORABLE CECIL PURYEAR, JUDGE

_____

Before QUINN and REAVIS and JOHNSON, JJ.

Appellant Joe L. Martinez appeals from his conviction for possession of a controlled substance with intent to distribute. He urges that his detention by the police was illegal and the evidence discovered pursuant to his illegal detention should have been suppressed. We affirm.

## I.  BACKGROUND

For over one month before August 19, 2000, a drug task force of federal, city and county law enforcement officers had been maintaining intermittent surveillance of apartment 104 of the Fountains Apartments in Lubbock, Texas.  Surveillance was maintained because the task force had information that illegal drug-related activities might be occurring at the apartment.  Task force members asked the manager of the Fountains to alert them if she noted any suspicious activity in connection with apartment 104.  The manager reported suspicious activity at the apartment four or five times before August 19, 2000.

At approximately 5:00 p.m. on Saturday, August 19th, Angela Smith, manager of the Fountains, called Lubbock County Sheriff's deputy Tony Menchaca.  Menchaca had been a police officer for 21 years, had been with the Lubbock County Sheriff's department 11 years, and had been assigned to the narcotics division of the Sheriff's office for three years.  Menchaca was at his home when he received the call from Smith.  Smith told Menchaca that two hispanic males, later identified as appellant and Lucas Morin, had come to the manager's office and asked for a key to apartment 104, which they claimed belonged to "their girlfriend."  Smith related that she refused to give the men a key because they were not on the apartment lease, whereupon the men left the office and walked toward apartment 104. She told Menchaca that the Fountains' maintenance man followed the men back to the apartment and discovered that a sliding door to apartment 104 was off its track and cocked out at an angle to the door frame.  Smith expressed her concern that the men were going to break into apartment 104.

2

Menchaca proceeded to the apartment complex within a few minutes after receiving Smith's call. He was not in uniform. He anticipated possible drug-related activity and parked in the parking lot so he could observe apartment 104.

When Menchaca first arrived, he went directly to apartment 104. There he found that the front door had not been tampered with and was secure. A sliding glass door to the apartment was located inside a small area enclosed by a wooden fence. The sliding door was off its tracks, the bottom of the door was six to eight inches outside of the apartment and the top of the door was bent. Menchaca had been at the apartment a few weeks earlier and the sliding door was not then off its tracks. The appearance of the sliding door indicated to Menchaca that someone had tried to gain entry to the apartment.

Menchaca proceeded to the apartment complex office in an attempt to locate manager Smith and the maintenance man. He did not locate Smith, but the maintenance man called him on the telephone and reported that the two men had been "hanging around" the apartment.

As Menchaca was returning to the area of apartment 104 he saw two men who matched the description of the men reported by Smith and the maintenance man. The men, appellant and Morin, were walking from the parking lot toward apartment 104. Menchaca went to his car and watched the two men, who by that time were standing close to the front door of apartment 104 and close to the wooden fence enclosing the sliding glass door to the apartment. One of the men talked on a cell telephone. The other stood in front of the apartment, looking around. The men were looking around in what Menchaca

3

characterized as a "suspicious" manner, although he agreed that the men could have been merely watching for the apartment residents. The men also kept glancing at Menchaca sitting in his unmarked car, so he moved his vehicle to another location from which he continued to watch them.

One of the men took his shirt off, laid it over the top of the wooden fence enclosing the area of the sliding glass door, and looked over the fence and into the sliding glass door. Menchaca thought that they were going to jump over the fence and break into the apartment. He radioed the Lubbock Police Department dispatcher for backup units because he wanted a marked police unit and uniformed officers for backup assistance. Menchaca related the situation to the police dispatcher, including his observation that the sliding glass door was off its tracks and that he suspected a burglary in progress.

Menchaca maintained surveillance of the two men while he waited for the marked police unit to arrive. During his surveillance, Menchaca observed a woman walk to the front of apartment 104, hug one of the two men and open the front door with a key. The woman and the two men then entered the apartment. After a few minutes, the woman walked out of the apartment and toward a car in the parking lot. Menchaca was going toward the car to detain and talk to the woman when the two men exited the apartment. About that time Lubbock police officer James Sullivan arrived in his marked police car. Menchaca quickly briefed Sullivan, who was in uniform, directed Sullivan to detain the two males, and went to detain the female, who by this time was inside a vehicle.

Sullivan shouted for the two men to stop. The men glanced toward Sullivan, and moved hurriedly toward the parking lot. Sullivan began running toward the men as they moved toward the parking lot and, as he passed by, glanced at the sliding glass door of apartment 104 to confirm that the door was off its sliding track as Menchaca had told him. Sullivan was yelling at the men all the time he was running after them, to no avail. The men entered a car and drove away. As the men's vehicle stopped for and was waiting for an exit gate to open, Sullivan caught up with the car and ordered the men to get out. He searched the men, discovered drugs in the trousers of appellant, and placed appellant under arrest.

Appellant moved to suppress evidence of the drugs. Following a pretrial hearing at which no evidence was presented other than testimony of Menchaca and Sullivan, the trial court overruled the motion to suppress without entering specific findings. Appellant then pled guilty and a jury assessed punishment at incarceration for 40 years.

Appellant urges two issues on appeal. His first issue asserts that his detention by Sullivan was in violation of his rights under the Fourth Amendment to the United States Constitution, the drugs found in his possession by Sullivan were fruits of the illegal detention and the trial court abused its discretion in overruling his motion to suppress evidence of the drugs. His second issue urges that the detention violated his rights under Article 1, § 9 of the Texas Constitution, and evidence of the drugs was inadmissible pursuant to TEX. CRIM. PROC. CODE ANN. § 38.23 (Vernon Supp. 2002).[1]

---

[1]Further references to the Code of Criminal Procedure will be by reference to "CCP _."

5

## II. LAW

## A. Standard of Review

Generally, a trial court's ruling on a motion to suppress is reviewed by an abuse of discretion standard. See Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App. 1999). We must uphold the trial court's decision on any proper grounds, whether or not relied upon by the trial court, when the standard of review is abuse of discretion. See State v. Ross, 32 S.W.3d 853, 855-56 (Tex.Crim.App. 2000).

In reviewing trial court rulings on matters such as motions to suppress, appellate courts afford almost total deference to trial court determinations of historical facts and to decisions involving mixed questions of law and fact if the resolution of those questions depends on an evaluation of credibility and demeanor. See Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). Mixed questions of law and fact not dependent on evaluation of credibility and demeanor are reviewed *de novo*. Id. If no explicit findings of fact are made by the trial court, appellate courts assume that the trial court made implicit findings of fact which are supported by the record and which support the conclusion of the court. See Ross, 32 S.W.3d at 855.

Detention and reasonable suspicion are by nature legal concepts and are properly subject to *de novo* review. See Hunter v. State, 955 S.W.2d 102, 107 (Tex.Crim.App. 1997); Sanders v. State, 992 S.W.2d 742, 744 (Tex.App.--Amarillo 1999, pet. ref'd). Accordingly, for purposes of Fourth Amendment analysis we give appropriate deference to the trial court's determination of historical facts, but we review the decision of the trial

court *de novo* as to whether the historical facts, viewed from the standpoint of an objectively reasonable person so situated as was the police officer, amount to "reasonable suspicion" sufficient to justify an investigatory detention. Ornelas v. United States, 517 U.S. 690, 697-99, 116 S.Ct. 1657, 1661-62, 134 L.Ed.2d 911 (1996); Guzman, 955 S.W.2d at 89.

## B. Investigatory Detention

Texas courts follow the guidance of the United States Supreme Court when interpreting the federal constitution and the rights thereunder. State v. Guzman, 959 S.W.2d 631, 633 (Tex.Crim.App. 1998). The Fourth Amendment to the U. S. Constitution protects persons from unreasonable searches and seizures. Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960); Davis v. State, 947 S.W.2d 240, 242 (Tex.Crim.App. 1997). The Fourth Amendment standard for judging the reasonableness of a search or seizure is an objective standard based upon the record presented. See Ornelas, 517 U.S. 690, 116 S.Ct. at 1661-62.

If police know specific and articulable facts which create a reasonable suspicion that a person they encounter might have been, is or may in the future become involved in a crime, then a Terry[2] stop may be made to investigate that suspicion. See United States v. Hensley, 469 U.S. 221, 228-229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). A "reasonable suspicion" exists if a reasonable person in the position of the officer making the stop, with the training and experience of the officer, and with the knowledge possessed

---

[2]Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

by the officer, could suspect that the vehicle or person stopped has been or is connected to criminal activity. See United States v. Cortez, 449 U.S. 411, 421-22, 101 S.Ct. 690, 697, 66 L.Ed.2d 621 (1981); Sanders, 992 S.W.2d at 748-49. The subjective thoughts and intentions of the officer making the stop are not determinative of whether articulable facts support a reasonable suspicion. Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). The Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent of the officers involved. Whren, 517 U.S. at 814, 116 S.Ct. at 1775. Circumstances to be considered in determining the reasonableness of a detention are those known by the officer making the stop as well as those collectively known by officers or agents cooperating in effecting the stop. See State v. Jennings, 958 S.W.2d 930, 933 (Tex.App.--Amarillo 1997, no pet.). Determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior. See Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000).

Article I, § 9 of the Texas Constitution does not encompass a more stringent standard than the Terry standard which is used to evaluate a temporary investigative stop by a police officer. Rhodes v. State, 945 S.W.2d 115, 117 (Tex.Crim.App. 1997). The standard used to measure conduct of police under Article I, § 9 of the Texas Constitution is, like the standard used to measure conduct under the Fourth Amendment, an objective standard. Crittenden v. State, 899 S.W.2d 668, 673-74 (Tex.Crim.App. 1995); Gordon v. State, 801 S.W.2d 899, 912 (Tex.Crim.App. 1990). That is, the reasonableness of the

8

officers' conduct is not determined by the subjective thoughts and intent of the officers involved. Id.

## III. ANALYSIS

### A. United States Constitution

In determining whether appellant's detention was in violation of the Fourth Amendment standard of reasonableness, we look objectively at the facts known by Menchaca and Sullivan prior to appellant's detention by Sullivan. Although the record contains testimony by both Menchaca and Sullivan of their subjective beliefs and conclusions as to reasonable suspicion and probable cause, the legality of the investigatory stop is not dependent on the subjective mindset or reasoning of the officers in deciding to stop appellant. Whren, 517 U.S. at 812-13, 116 S.Ct. at 1772-74. Thus, neither the trial court nor we are bound by opinions expressed by Menchaca and Sullivan as to existence of reasonable suspicion for stopping, or probable cause for arresting, appellant and his companion.

The factors before Menchaca and Sullivan at the time Sullivan detained appellant were: (1) apartment 104 had been under surveillance for possible drug-related activity for some weeks before the date of appellant's arrest; (2) police had requested the manager of the apartments to call if any "suspicious activity" was noted as to apartment 104; (3) the manager called police about suspicious activity in connection with apartment 104 on occasions before August 19th; (4) the manager called Menchaca at Menchaca's home on Saturday afternoon because appellant and Morin asked for a key to apartment 104, neither

9

appellant nor Morin were on the lease agreement, and the manager concluded that actions of the men were "suspicious" enough to both call Menchaca and have the apartment maintenance man follow appellant and Morin as they left the manager's office; (5) when Menchaca arrived at the apartments, he found the sliding glass door to apartment 104 off its track and the base of the door pulled away from the track; (6) appellant and Morin walked to apartment 104 and stayed just outside the door while Menchaca maintained them under surveillance; (7) one of the men seemed to be paying close attention to Menchaca as he sat in his car observing apartment 104 and the two men; (8) one of the men constantly looked around as the two men waited outside apartment 104; (9) one of the men took his shirt off, placed it on top of the fence surrounding the enclosed area around apartment 104, leaned over the fence and peered into the apartment through the patio sliding door which was off its track; (10) the sliding door had not been off its track when Menchaca was at the apartments previously; (11) Menchaca then observed a female approach apartment 104, hug one of the men and open the apartment door with a key; (12) the woman and two men entered the apartment and after a short time emerged from the apartment; (13) officer Sullivan then arrived on the scene in his uniform, was briefed by Menchaca and directed to detain appellant and Morin, immediately shouted for them to stop, and ran toward the two men, shouting for them to stop as the two men first looked at Sullivan, then turned and hurried away from him in such manner that Sullivan believed they were trying to evade him;[3] (15) Sullivan continued running toward them and shouting

[3]Appellant did not contest Sullivan's testimony that he believed appellant and Morin were attempting to evade him, nor does he assert on appeal that a fact question was presented to the trial court on the question. Appellant states in his brief that he presented no evidence at the suppression hearing to contest the State's witnesses' testimony, no fact

for them to stop, whereupon the men quickly went to and entered a car and sped away. It was after such departure that appellant was stopped.

The controlling determination is whether, based upon the specific articulable factors known to the officers cooperating in the detention, see Jennings, 958 S.W.2d at 933, and evaluating the totality of the circumstances as an experienced law enforcement officer would have evaluated them as of the time appellant was stopped by Sullivan, a reasonably prudent man could have suspected that appellant may have been or was then engaged in criminal activity. See Sanders, 992 S.W.2d at 749. If so, Sullivan's action in stopping appellant to investigate further was not improper.

Appellant argues that Menchaca observed appellant and Morin for a total of 40-45 minutes without seeing either man commit an illegal act, an act preparatory to an illegal act or any act consistent with either man having previously tried to enter apartment 104. To the contrary, appellant urges, Menchaca had seen a woman later identified as a resident of the apartment open the door with a key and let appellant and Morin into the apartment.

The applicable test for legality of appellant's detention, however, is not whether the officers actually saw appellant or Morin perform illegal acts or acts consistent with having entered the apartment illegally. The test is whether the enumerated articulable

---

question was before the trial court, and that our review is *de novo*. See  Hunter, 955 S.W.2d at 107; Guzman, 955 S.W.2d at 89. In any event, to the extent a fact question might have been created, no explicit findings were made by the trial court, and we assume that the trial court made implicit findings of fact which are supported by the record and which support the conclusion of the court. See Ross, 32 S.W.3d at 855. Such implied finding would include a finding that appellant and Morin were attempting to evade or flee from Sullivan after he called to them to stop.

11

circumstances, including the evasive actions taken by appellant and Morin when directed to stop by a uniformed police officer, could cause a reasonable man with the training and knowledge of officers cooperating in the detention to suspect that appellant might have been or was involved in criminal activity. Even if we assume, *arguendo*, that the facts and factors known to Menchaca at the time he directed Sullivan to detain appellant and Morin were insufficient to detain appellant without violating his Fourth Amendment rights, those factors must be considered together with the factor of appellant's flight from Sullivan. As the United States Supreme Court recently noted, an individual has a right to ignore a police officer who approaches that individual without reasonable suspicion or probable cause. See Wardlow, 528 U.S. at 125, 120 S.Ct. at 676. The approached individual may go about his or her business and refuse to cooperate. A refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure, but, evasive behavior is a factor relevant to determining reasonable suspicion. Id. Flight from an officer is the opposite of merely refusing to cooperate, remaining silent when questioned, or going about one's business. Id.

Determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior. Id. The evasive actions of appellant and Morin, when Sullivan did nothing to provoke evasion or flight except to call out to them to stop, together with the other articulable factors, created "reasonable suspicion" to allow a brief detention for further investigation.[4] See id. Appellant's first issue is overruled.

---

[4]Neither the legality of Sullivan's search of appellant, nor the propriety of appellant's arrest is before us. See Wardlow, 528 U.S. at 124 n.2, 126, 120 S.Ct. at 676 n.2, 677.

B.  Texas Constitution

Appellant acknowledges in his brief that the Texas Constitution and CCP art. 38.23 do not provide more protection to him in this matter than does the U. S. Constitution.  See Gordon, 801 S.W.2d at 912.  We have determined in considering issue one that appellant's rights under the federal constitution were not violated.  Thus, we need not and will not separately address his state constitution claim.  See TEX. R. APP. P. 47.1; Brown v. State, 943 S.W.2d 35, 36 n.3 (Tex.Crim.App. 1997).  Appellant's second issue is overruled.

IV.  CONCLUSION

Having overruled appellant's two issues, we affirm the judgment of the trial court.

Phil Johnson
Justice

Publish.