IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 8, 2003 Session

## ANGELA D. SIEFKER v. GARY C. SIEFKER

**Appeal from the Circuit Court for Davidson County**
**No. 98D-3861     Muriel Robinson, Judge**

_____

**No. M2002-01081-COA-R3-CV - Filed July 8, 2003**

_____

This case is before the Court for the second time on a post-divorce Petition to reduce alimony. The trial judge denied the Petition, and we affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and ROYCE TAYLOR, SP. J., joined.

D. Scott Parsley, Nashville, Tennessee, for the appellant, Gary C. Siefker.

Phillip Robinson, Nashville, Tennessee, for the appellee, Angela D. Siefker.

## OPINION

The history of this case is well stated by this Court in the opinion disposing of the previous application of Appellant/Husband to reduce his alimony obligation.

On July 9, 1999, Plaintiff/Appellee Angela D. Siefker ("Wife") was granted a divorce from Defendant/Appellant Gary C. Siefker ("Husband"), ending a twenty-three year marriage. The parties had two children, the older of which had reached majority at the time of the divorce. Among other obligations relating to the divorce decree, Husband was ordered to pay Wife $2,000 per month alimony *in futuro*, as well as $1,782 per month in child support for the parties' minor child.

At the time of the divorce, Husband was employed as a sales manager at a car dealership. In this capacity, he earned $168,580 in 1999, and $138,474 in 2000. On February 2, 2001, Husband was terminated from his job for "mismanagement of inventory." After a time, Husband found employment as a new truck salesman at a Chevrolet dealership. Husband testified that he hoped to earn $50,000 in his first year at the dealership. Husband made his monthly support payments in a timely

manner until December 2000. From January through May, 2001, Husband paid $8960 of the $18,910 in support that he owed for that period. Husband did not designate the money sent to Wife during this period as alimony or child support payments.

On October 30, 2000, Husband filed a petition to reduce his alimony on the basis of a substantial and material change in circumstances. On April 3, 2001, Husband amended his petition to seek a reduction in both alimony and child support, again, based on a substantial and material change in circumstances.

On June 14, 2001, the trial court held a hearing on Husband's petition to reduce his child support and alimony payments. At the hearing, the evidence showed that Husband owned a race car worth $23,000, a motorcycle valued at $14,000, and over $47,000 in his 401(k) Plan. The testimony also showed that Husband received a $14,000 tax refund on April 3, 2001, a time when he was in support arrears. Wife's income remained approximately the same as it was at the time the parties divorced. Additionally, Wife moved from the family home into an apartment, reducing her monthly housing obligation by $200. Although she realized a $37,000 gain on the sale of the home, Wife testified that she used the money to move and to pay monthly expenses.

At the conclusion of the hearing, Husband's child support payments were terminated because the parties' minor child had graduated from high school. Regarding the alimony, the trial court found that Wife had a continued need for the alimony and that Husband was able to fulfill his financial obligations, considering his substantial assets and the fact that his earning capacity remained significantly greater than Wife's earning capacity. The trial court denied Husband's petition to reduce his monthly alimony payments. In view of Husband's available assets, the trial court declined Wife's request for a finding that he was voluntarily underemployed, concluding that such a finding was not necessary.

*Siefker v. Siefker*, No. M2001-01458-COA-R3-CV, 2002 WL 31443213, at * 1-2 (Tenn.Ct.App. Nov. 1, 2002).

This Court affirmed the action of the trial court, both in denying the application to reduce alimony and in finding Appellant to be in civil contempt for failure to pay alimony. In holding Appellant to be in civil contempt, the trial court observed:

[T]hat Husband testified that he hurriedly entered into the divorce agreement "so he could move on," and observed,

. . . [F]rom that time forth he has pretty much been on a mission to reduce this alimony. That's very evident. By his own testimony he's

> paid other bills instead of paying the alimony. He readily admitted that. And he also stated for the record that he is current with everything but his child support and alimony payment. And he stated, evidently in the discovery and I've got it written down here and underlined, that he will not pay the child support and alimony.
>
> . . . .
>
> He's had the wherewithal to pay the alimony. Based on the statements, he has refused. The Court feels this is willful. He'll be taken into custody until he complies with this order.

*Siefker*, 2002 WL 31443213, at * 2 n.3.

In affirming the action of the trial court, this Court stated: "Most importantly, at the time of the hearing, Husband retained substantial assets that were untouched, including a race car worth approximately $23,000, a motorcycle worth approximately $14,000, a 401(k) Plan of approximately $47,000 and a bank account of approximately $6,600. The trial court considered Husband's testimony that while he fell behind in his support payments, he kept all his other obligations current." *Id.* at * 4.

On October 31, 2001, while his appeal from the denial of his previous application for a reduction in alimony was pending, Appellant filed the Petition, which is the subject of this present appeal. In his Petition of October 31, 2001, Appellant averred: "Your Petitioner would state and show unto this Honorable Court that since the entry of the Final Decree of Divorce in this matter, there has been a material and substantial change in circumstances, justifying a reduction in alimony. Your Petitioner's income has been materially and substantially reduced as a result in the termination, then subsequent modification of his income, through no intentional fault of his own."

The answer of Appellee to this Petition averred, and the evidence showed without contradiction, that under the terms of the Final Decree of Divorce, Appellant was to pay the sum of $2,000 per month in alimony. For the month of July 2001, he paid $800. For the month of August 2001, he paid $500. For the month of September 2001, he paid $500. For the month of October 2001, he paid $500. For the month of November 2001, he paid nothing.

The hearing on this Petition occurred May 2, 2002, where the only witness to testify, other than the parties, was Appellant's employer, Jim Grant. Once again, one of the issues before the court was the same issue that was before the court in the previous Petition to reduce alimony. Appellant had lost his job. At the time of the divorce, he had been sales manager at Tom Bannon Chevrolet, a dealership owned by Jim Grant. Appellant, after his termination at Tom Bannon, had worked elsewhere in the car sales business but then returned to Tom Bannon as a salesman. Jim Grant testified:

Q. Did you terminate him back last year?
A. Yes, as I recall, about February I think.
Q. Would you tell the Court why he was terminated?
A. He - more than one thing. One issue was he, in my opinion, mismanaged the inventory, and he had lost his fire that is necessary for a sales manager. Gary turned to somewhat of a - it seemed to me like he felt defeated, and for that reason he needed to go. You can't have somebody - The speed of the captain is the speed of the ship.
Q. So you terminated him, is that correct?
A. Yes.

Appellant testified that he had disposed of all of the assets that he owned prior to the hearing on his previous Petition and had used the proceeds, in part, to pay his alimony arrearage. In the interim, he had remarried and, with his new wife, purchased a new home which he and his wife promptly refinanced to a fifteen year payout, rather than a thirty year payout. This, of course, increased the monthly mortgage payment. His present wife had an income of $43,000 per year and was paying half of the mortgage payment on the house.

Appellant testified:

Q. But you were married at that point, weren't you? You had wife that could help you. She would help you, wouldn't she?
A. But we had two houses at that time, too. The house situation didn't come up - We didn't sell her house until the end of January.
Q. September of 2000, you only paid $500 in alimony, do you recall that?
A. Yes.
Q. Yet on your own petition you show you had $4,384 then. You could have paid your $2000 in alimony, couldn't you?
A. No.
Q. Couldn't do it?
A. No, if I could have I would have.
Q. And then for the month of October, you only paid $500 then, didn't you, sir?
A. Yes.
Q. And for the month of November, let's see, at the time you filed this petition, you didn't pay anything, do you recall that?
A. Yes.
Q. Now the fact is you were working during that whole period of time?
A. Yes.
Q. This is when you were disposing of your vehicles, correct?
A. Yes.
Q. And yet you had the money coming in you just didn't pay it, did you?
A. I had more money going out other than alimony.

Q. Well you house note is current, isn't it?
A. It is.
Q. And it's been current since we were here in June, hasn't it?
A. Yes, it beats living in a box under a bridge.
Q. I understand. And utilities, you've kept them turned on, haven't you?
A. Yes.
Q. And you made these $250 payments for your kids in college, didn't you?
A. I caught it up when the trailer -
Q. It's just this alimony that's the problem for you paying, isn't that right, sir?
A. That's really where the excess is, I mean I -

It was at this point in the proceedings that the trial court intervened and cut the hearing somewhat short. From July through November of 2001, Appellant had paid his alimony obligations at 23¢ on the dollar. He would have made a better impression on the trial court if he had rationed his payments to other creditors in a similar fashion, but of course, he did not.

In overruling Appellant's Petition to reduce his alimony and holding him in criminal contempt of court for failure to pay, the trial court held:

THE COURT: It is obvious that Mr. Siefker has set upon a course to defeat the decree of this Court regarding his payment of alimony to his former wife, and he's done this from day one. And what's so amazing, he is the one that engineered the property settlement and asked me to approve what he put before the Court.

There has been absolutely no change of circumstance. He is going to do everything he can to circumvent this Court's order, and Mr. Siefker, it's not going to work. You are your own worst enemy. Not only do you control how much you make at your profession, you shut it down when you think it's to your benefit. And it's just coincidental that you have a downturn in your financial situation after the ink was dry on this decree.

The first thing you did was file a petition to try and get out of it. At that time you had the funds to pay this. You knew what your obligation was and you asked me to impose those obligations and you have the wherewithal to meet it.

There has been absolutely no change of circumstance since June. She has a need and you have the ability to pay. Even though you've tried to convince everybody you don't, you still do, even if I go on your figures. It's very plain. Your conduct is just blatant in here.

In addition to that you don't pay every month like it says. You're in criminal contempt of the order of this Court. What is it that you don't understand about paying $2,000 on the 15th of the month?

You do understand that, don't you?

MR. SIEFKER: Yes, Your Honor.

THE COURT: It is a primary obligation but what you do is you pay your other bills before you pay this one, you make other bills before you pay this one, you get rid of bills and you still don't pay this one.

The proof shows, your proof shows that even after June that you had the proceeds from the sale of this car of $20,000. Well you knew you had to take that and pay the arrearage that the Court already ordered; you knew you had to do that. You could have paid in advance or put it somewhere where you could have paid this $2,000 a month. Then, in addition, you got another $14,000 for your motorcycle. That was money that could have been used to pay this alimony. Then you got the insurance claim, $7,467. You get the money and you just pay what you want to. The one bill that you don't want to pay is the one that you don't pay and it happens to be the alimony to your former wife that you asked me to approve to insure that she had a standard of living after the divorce that wasn't to her detriment and was comparable to that before the divorce.

So this is what you do , you get the divorce, you ask me to approve the agreement, you immediately quit your job, you change jobs, you petition the Court to terminate your alimony, then you set upon a course to further undo the agreement regarding how you're going to conduct yourself and your employment in the future. You try to down scale it, you bring your employer in here, you blame it on 9/11, you know, everything. It's not going to wash in this court.

In addition, you bought a new house, you married the woman, your paramour that was discussed in the divorce decree, which sometimes that happens and you're at liberty to do but not to the financial detriment of your former wife when you make an obligation here.

You say that your present wife supports you so you have additional income or income that's available to you. You bought a new house knowing that you had this obligation of $2,000 to your former wife. You increased your personal expenses knowing that you had this obligation, and what do you do? You pay your expenses and don't pay this obligation. Then your taxes, you have all these taxes withheld knowing that you're withholding way too much because you can deduct alimony.

Now the only problem that I find here is that Mrs. Siefker waits too long to file these contempt petitions. Don't let this man get $14,000 behind in his alimony. You need to file this thing right when he fails to pay because, you know, if he's going to get money together he needs to do it right away.

Even if I take as true his testimony about his present income, he can pay this amount. So this petition has no merit whatsoever and these findings of facts, and really based on his testimony, he's trying to arrange his life to avoid paying this and he has the wherewithal to pay and he still has assets to pay, he has enough income to pay, he had money to pay, he just spent it on other bills. He's paid his other bills first before he's paid this one. Then he's had a decrease because he no

longer has the obligation of the child support and college for one of the children. So his payments under this decree have been reduced.

So I find that he's in willful criminal contempt, I award her a judgment of $14,000, put this as a lien against his house. He's going to have to pay this. I'm going to sentence him to 70 days in the Metro Jail and a fine, and he needs to cease and desist trying to circumvent the orders of this Court. It's not going to work. I don't think you're going to convince the Court of Appeals that this is going to work because you've set upon a course to undermine the Court's orders.

I assess the costs to him, I'll allow this $3,200-whatever it is in attorney's fees, and like I said, I'm to the point of almost introducing sanctions here because you cannot continue to litigate her out of existence here. It is not going to work. So draw the order, Mr. Robinson.

Take him to custody.

MR. PARSLEY: Will Your Honor make a finding as to whether or not he's voluntarily underemployed?

THE COURT: He has voluntarily reduced his income by not working to his potential. But that really doesn't have anything to do with this case. That's part of it but he has assets. It's his mind set that he's stuck on a course to undermine this order. He does not want to pay this alimony so he's going to try everything within his power, including using the court system, to do it. But it's not going to work because his own testimony is against him.

MR. PARSLEY: And Your Honor is going to rule that he has assets to pay this?

THE COURT: He has assets to pay it, he's got the frame of mind to do it, he just won't do it.

The trial court has nurse-maided this case since the divorce was granted in July of 1999. Nothing has changed since the Opinion of this Court in the previous appeal except for the disposition of certain assets. Mr. Siefker had been terminated from his job and had a greatly reduced income at the time the trial court denied his first application to reduce his alimony obligation on June 14, 2001.[1] Nothing that has happened since the previous petition was denied is unforseen or unforeseeable. Mr. Siefker remarried, bought a new house and, obviously, took advantage of low interest rates in order to refinance the house and pay it off in fifteen years. This makes sound business sense but voluntarily increases his monthly payments.

More offensive to the trial court, and indeed offensive to this Court, is his continuation of the same pattern of behavior that brought about his civil contempt on his previous application to reduce alimony. He continues to put his alimony obligation on the back burner when it should be on the front burner. He pays all of his other bills, and, if he has anything left over, he pays a small percentage of his monthly alimony. In spite of previous warnings from the trial court, he continues

---

[1] For some reason, not apparent in this record and not explained either in brief or argument, the $47,000 in his 401(k) Plan never figures in anyone's calculations. What, if anything, happened to it simply remains a mystery.

to relegate his alimony obligation to the lowest priority, thereby instructing his former wife, in the country music vernacular, to "take a cold tater and wait." This is not the way the system works. To repeat to him the same message given by this Court on November 1, 2001:

> Modification of alimony award is factually driven, calling for a careful balance of many factors. *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) (citations omitted). The trial court is given wide latitude, and its decision will not be disturbed unless it is "not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Id.* Therefore, the decision of the trial court will not be disturbed unless it evidences an abuse of discretion. A trial court abuses its discretion when it reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard. *Eldridge v. Eldridge*, 72 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

*Siefker*, 2002 WL 31443213, at * 3.

Appellant's protestations to the contrary notwithstanding, the trial court has found him to be underemployed and has determined that such underemployment is deliberate. The evidence does not preponderate against the finding of the trial court. Tenn. R. Civil P. 13(d). In setting the amount of alimony, the trial court has not abused its discretion. *Eldridge v. Eldridge*, 72 S.W.3d 82, 85 (Tenn. 2001).

The deliberate action of Appellant in relegating his alimony obligation to one that is to be satisfied only by his unilateral application of self-adjudged excess funds in the face of a court order and a previous affirmation on appeal of that court order justifies the criminal contempt sanction of the trial court, which is affirmed.

The application of Appellee for attorney's fees on appeal is granted, and on remand, the trial court will adjudge reasonable attorney's fees for this appeal.

The action of the trial court is in all respects affirmed, and the case is remanded to the trial court for further proceedings, including the setting of reasonable attorney's fees.

Costs of the cause are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE